No. 19-1152

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

FRIENDS OF BUCKINGHAM, et al.,
Petitioners,

v.

STATE AIR POLLUTION CONTROL BOARD, et al.,
Respondents,

and

ATLANTIC COAST PIPELINE LLC,
Intervenor.

On Petition for Review of Approval and Issuance of Stationary Source
Permit No. 21599 by the State Air Pollution Control Board and the
Virginia Department of Environmental Quality

### BRIEF OF RESPONDENTS

MARK R. HERRING
*Attorney General*

DONALD D. ANDERSON
*Deputy Attorney General*

PAUL KUGELMAN
*Senior Assistant*
*Attorney General*

TOBY J. HEYTENS
*Solicitor General*

MICHELLE S. KALLEN
*Deputy Solicitor General*

MARTINE E. CICCONI
*Deputy Solicitor General*
*Designate**

BRITTANY M. JONES
*John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
SolicitorGeneral@oag.state.va.us

*Counsel for Respondents*

**Pending Admission to Va. Bar*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 19-1152        Caption: Friends of Buckingham, et al. v. State Air Pollution Control Bd.,et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Richard D. Langford, Chair of the State Air Pollution Control Board
(name of party/amicus)

_____

who is _____respondent_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                            ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                               ☐ YES ☑ NO
      If yes, identify all such owners:

09/29/2016 SCC                          - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Matthew L. Gooch      Date: 2/14/2019

Counsel for: Richard D. Langford, Chair, APCB

## CERTIFICATE OF SERVICE
***************************

I certify that on ___2/14/2019___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Matthew L. Gooch      2/14/2019
(signature)      (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __19-1152__   Caption: __Friends of Buckingham, et al. v. State Air Pollution Control Bd., et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__David K. Paylor, Director, Virginia Department of Environmental Quality__
(name of party/amicus)

_____

who is _____respondent_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?   ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Matthew L. Gooch          Date: 2/14/2019

Counsel for: David K. Paylor, Director VADEQ

## CERTIFICATE OF SERVICE
**************************

I certify that on   2/14/2019   the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Matthew L. Gooch                   2/14/2019
(signature)                           (date)

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __19-1152__     Caption: __Friends of Buckingham, et al. v. State Air Pollution Control Bd.,et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

State Air Pollution Control Board
_____
(name of party/amicus)

_____

who is _____respondent_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?       ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?       ☐ YES ☑ NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: __/s/ Matthew L. Gooch_____    Date: _____2/14/2019_____

Counsel for: __State Air Pollution Control Board____

## CERTIFICATE OF SERVICE
****************************

I certify that on _____2/14/2019_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

__/s/ Matthew L. Gooch_____          _____2/14/2019_____
        (signature)                              (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _19-1152_    Caption: _Friends of Buckingham, et al. v. State Air Pollution Control Bd., et al_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Virginia Department of Environmental Quality_
(name of party/amicus)

_____

who is _____respondent_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Matthew L. Gooch                          Date:      2/14/2019

Counsel for: Va. Dept. of Environmental Quality

## CERTIFICATE OF SERVICE
****************************

I certify that on _____2/14/2019_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Matthew L. Gooch                                      2/14/2019
_____(signature)_____                              _____(date)_____

- 2 -

# TABLE OF CONTENTS

DISCLOSURES OF CORPORATE STATEMENTS AND OTHER
INTERESTS ..................................................................................i

TABLE OF AUTHORITIES...................................................... iii

INTRODUCTION........................................................................1

JURISDICTIONAL STATEMENT ...........................................3

ISSUES PRESENTED ...............................................................4

STATEMENT ..............................................................................5

    A.    Statutory and Regulatory Background ...............................5

    B.    Factual Background ....................................... 14

SUMMARY OF ARGUMENT ...................................................33

STANDARD OF REVIEW.........................................................36

ARGUMENT ..............................................................................38

I.    In granting the challenged permit, the Board was not
required to consider use of electric motors in lieu of natural
gas turbines ....................................................................... 38

    A.    Virginia regulations establish that the Board need not
consider alternative emission sources as part of its
"best available control technology" review ........................... 39

    B.    The Board's interpretation of its regulations is entitled
to deference ........................................................... 49

II.    The Board fully considered the Section 10.1-1307 factors ...........51

CONCLUSION ..........................................................................57

STATEMENT REGARDING ORAL ARGUMENT ................59

CERTIFICATE OF COMPLIANCE.........................................59

CERTIFICATE OF SERVICE..................................................60

# TABLE OF AUTHORITIES

## Cases

*Alliance to Save the Mattaponi v. Commonwealth Dep't of Envtl. Quality,*
 621 S.E.2d 78 (Va. 2005) ....................................................................36

*Appalachian Voices v. State Water Control Bd.,*
 912 F.3d 746 (4th Cir. 2019) ..........................................................36, 37

*Auer v. Robbins,*
 519 U.S. 452 (1997) ............................................................................39

*Cowpasture River Pres. Ass'n v. Forest Serv.,*
 911 F.3d 150 (4th Cir. 2018) ...............................................................14

*Delaware Riverkeeper Network v. Secretary of the Pa. Dep't of Envtl. Prot.,*
 870 F.3d 171 (3d Cir. 2017) .................................................................36

*Helping Hands Tools v. EPA,*
 848 F.3d 1185 (9th Cir. 2016) ................................................45, 47, 50

*Horne v. Commonwealth Real Estate Bd.,*
 705 S.E.2d 535 (Va. Ct. App. 2011) ....................................................38

*Kisor v. Wilkie,*
 139 S.Ct. 2400 (2019) ................................................................. passim

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29 (1983) ..............................................................................37

*Office of Consumers' Counsel v. FERC,*
 655 F.2d 1132 (D.C. Cir. 1980) .............................................................6

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,*
 556 F.3d 177 (4th Cir. 2009) ...............................................................37

*Ohio Valley Envtl. Coal., Inc. v. U.S. Army Corps of Eng'rs,*
 716 F.3d 119 (4th Cir. 2013) ...............................................................37

*Powder River Basin Res. Council v. Wyoming Dep't of Envt'l. Quality,*
 226 P.3d 809 (Wyo. 2010) ...................................................................48

*Schneidewind v. ANR Pipeline Co.,*
 485 U.S. 293 (1988) ..............................................................................5

iii

*Sierra Club v. EPA*,
  499 F.3d 653 (7th Cir. 2007)........................................................ passim

*Sierra Club v. Moser*,
  310 P.3d 360 (Kan. 2013) ...................................................... 48

*Sierra Club v. State Water Control Bd.*,
  898 F.3d 383 (4th Cir. 2018)............................................. 36, 37

*Whitman v. American Trucking Associations*,
  531 U.S. 457 (2001)............................................................ 7, 23

## Administrative Cases

*Atlantic Coast Pipeline, LLC*,
  161 FERC ¶ 61,042, ¶¶ 257, 271, 274, 325 (2017)..................... 15, 43

*Atlantic Coast Pipeline, LLC*,
  164 FERC ¶ 61,100, ¶¶ 257, 271, 274, 325 (2018)..................... 15

*In re City of Palmdale (Palmdale Hybrid Power Project)*,
  15 E.A.D. 700 (E.A.B. 2012) .................................................. 48

*In re Prairie State Generating Co.*,
  2006 WL 2847225 (EAB 2006) ............................................... 46

*In re Russell City Energy Ctr., LLC*,
  15 E.A.D. 1 (E.A.B. 2010) ....................................................... 48

*In re SEI Birchwood, Inc.*,
  5 E.A.D. 25 (E.A.B. 1994) ...................................................... 48

*Snyder v. Pennsylvania*,
  No. 2015-027-L, 2015 WL 9590755
  (Pa. Envtl. Hr'g Bd. Dec. 21, 2015) ..................................... 42

## Statutes

5 U.S.C. §§ 505 *et seq.*................................................................ 36

5 U.S.C. § 701 ........................................................................... 36

15 U.S.C. §§ 717 *et seq.*.............................................................. 5

15 U.S.C. § 717f......................................................................... 3

15 U.S.C. § 717f(c) ..................................................................... 5

15 U.S.C. § 717n ....................................................................... 5

iv

15 U.S.C. § 717n(b)(1) ................................................................ 5

15 U.S.C. § 717r(d)(1) ................................................................ 3

42 U.S.C. §§ 4321 *et seq.* .......................................................... 6

42 U.S.C. § 4332(C) .................................................................... 6

42 U.S.C. §§ 7401 *et seq.* .......................................................... 6

42 U.S.C. § 7407(d) .................................................................... 9

42 U.S.C. § 7409 ........................................................................ 7

42 U.S.C. § 7410 ........................................................................ 8

42 U.S.C. § 7410(a)(2) ................................................................ 9

42 U.S.C. § 7410(a)(2)(C) ...................................................... 8, 44

42 U.S.C. § 7410(a)(2)(D)(i)(I) .................................................. 9

42 U.S.C. § 7412 ...................................................................... 23

42 U.S.C. § 7416 ........................................................................ 9

42 U.S.C. §§ 7470–7492 ............................................................ 8

42 U.S.C. § 7475 ...................................................................... 41

42 U.S.C. § 7475(a) ............................................................. 44, 45

42 U.S.C. § 7475(a)(4) .............................................................. 45

42 U.S.C. § 7479 ........................................................................ 7

42 U.S.C. § 7479(3) .................................................................... 8

42 U.S.C. § 7503(a) .................................................................... 8

42 U.S.C. § 7503(c) .................................................................... 8

Va. Code Ann. § 2.2-4027 ........................................................ 36

Va. Code Ann. §§ 10.1-1301 *et seq.* .......................................... 9

Va. Code Ann. § 10.1-1307(E) ............................................. passim

Va. Code Ann. §§ 10.1-1307(E)(1)–(4) ..................................... 13

Va. Code Ann. § 10.1-1307(E)(1) ............................................. 52

Va. Code Ann. § 10.1-1307(E)(2) ............................................. 52

Va. Code Ann. § 10.1-1307(E)(3) ......................................... 35, 52

Va. Code Ann. § 10.1-1307(E)(4) ............................................................ 52

Va. Code Ann. § 10.1-1321.1(A) ............................................................ 14

Va. Code Ann. § 10.1-1322 ...................................................................... 10

Va. Code Ann. § 10.1-1322.01(N) ........................................................... 10

Va. Code Ann. § 10.1-1322.01(P) ............................................................ 10

Va. Code Ann. §§ 15.2-2200 *et seq.* ...................................................... 13

Va. Code Ann. § 67-102 ........................................................................... 52

Va. Code Ann. § 67-102(11) ..................................................................... 13

Va. Code Ann. § 67-102(5) ....................................................................... 13

## Administrative Regulations

40 C.F.R. pt. 50 ........................................................................................ 6

9 Va. Admin. Code § 5-50-240 ................................................................ 11

9 Va. Admin. Code § 5-50-250 ............................................ 11, 39, 42, 45

9 Va. Admin. Code § 5-50-250(C) ........................................................... 11

9 Va. Admin. Code § 5-50-260 ................................................... 11, 40, 45

9 Va. Admin. Code § 5-80-5(C) ............................................................... 10

9 Va. Admin. Code § 5-80-25(D) ............................................................ 10

9 Va. Admin. Code § 5-80-850 ................................................................ 57

9 Va. Admin. Code § 5-80-1110(C) .................................................. 11, 40

9 Va. Admin. Code § 5-80-1180(A)(1) .................................................... 12

9 Va. Admin. Code § 5-80-1180(A)(3) .................................................... 12

9 Va. Admin. Code § 5-80-1190 ....................................................... 11, 39

9 Va. Admin. Code § 5-80-1190(1)(a) ..................................................... 42

9 Va. Admin. Code § 5-80-1210 .............................................................. 12

## Administrative Materials

Environmental Protection Agency,
   *Plan EJ 2014 Legal Tools* (Dec. 2011) ............................................. 7, 55

Federal Energy Regulatory Commission,
  *Atlantic Coast Pipeline and Supply Header Project:*
  *Final Environmental Impact Statement* (2017) .................. 5, 15, 16, 47

## Other Authorities

Kevin Ridder,
  *Pipeline Legal Disputes Escalate*, The Appalachian Voice,
  June 7, 2019 ........................................................................................ 14

## INTRODUCTION

This case presents a narrow question: whether a single Virginia state agency acted arbitrarily or capriciously when—after multiple meetings and rounds of public comment—it issued a permit for construction of a single compressor station. The answer is "no."

State regulators did not turn a blind eye to environmental justice when issuing the challenged permit. To the contrary, the Virginia Air Pollution Control Board (Board) and its staff conducted almost a year-and-a-half of study, held four public meetings and an information session with two separate rounds of public comment, engaged in extensive air quality modeling and analysis, and reviewed more than 5,300 comments. At the conclusion of that process, the Board found that the plethora of conditions imposed by the station's permit—in addition to the conditions imposed by federal and local regulators—provided reasonable assurances that the compressor station would not violate applicable state and federal standards.

This Court's duty in reviewing that decision is an important but limited one. The Court's role is not to second-guess the agency's judgment, but rather to ensure that the agency's process for reaching

1

that judgment was not arbitrary, capricious, or otherwise contrary to law. While reasonable minds may disagree with the Board's ultimate conclusion, the record shows that it fully—and carefully—discharged its legal obligations when it reviewed the challenged permit.

The petition for review should be denied.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 717r(d)(1). Under that provision, "[t]he United States Court of Appeals for the circuit in which a facility subject to" regulation under 15 U.S.C. § 717f "is proposed to be constructed" has "original and exclusive jurisdiction over any civil action for the review of an order or action of a . . . . State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit." 15 U.S.C. § 717r(d)(1).

Those elements are satisfied here. The challenged compressor station would be constructed in Buckingham County, Virginia, JA02955, and would provide propulsion for a natural gas pipeline subject to regulation under Section 717f, JA00254. And this petition challenges a permit issued by the Virginia Air Pollution Control Board pursuant to the federal Clean Air Act.

## ISSUES PRESENTED

(1)  Did the Virginia Air Pollution Control Board act
arbitrarily, capriciously, or otherwise contrary to law
in interpreting its minor source regulations as not
requiring consideration of alternative emission sources
in addition to control technologies that can be applied
to those minor sources?

(2)  Did the Virginia Air Pollution Control Board fail to
satisfy its obligation under Va. Code Ann. § 10.1-
1307(E) to consider the "facts and circumstances
relevant to the reasonableness of the activity,"
including:

- the potential injury to health and property;

- the social and economic value of the project;

- the suitability of the proposed site; and

- the scientific and economic practicality of reducing
any resulting pollution?

## STATEMENT

### A.   Statutory and Regulatory Background

Construction of natural gas pipelines is governed by a complex web of federal, state, and local regulations.

1.   The Natural Gas Act, 15 U.S.C. §§ 717 *et seq.*, requires those seeking to construct an interstate natural gas pipeline to apply for a "certificate of public convenience and necessity" from the Federal Energy Regulatory Commission (FERC). 15 U.S.C. § 717f(c). As part of its assessment of the overall project, FERC reviews any necessary components of the project, including compressor stations.[1] Because FERC has primary authority over interstate transportation of natural gas, *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 305 (1988), it functions as the "lead agency" in this context, 15 U.S.C. § 717n(b)(1), coordinating the necessary authorizations from other regulators, see § 717n.

---

[1] See Federal Energy Regulatory Commission, *Atlantic Coast Pipeline and Supply Header Project: Final Environmental Impact Statement* (2017) ("FERC EIS"), at 2-6–2-7, https://www.ferc.gov/industries/gas/enviro/eis/2017/07-21-17-FEIS/volume-I.pdf.

a.     Beyond its coordinating function, FERC reviews pipeline applications for compliance with applicable laws and regulations. *Office of Consumers' Counsel v. FERC*, 655 F.2d 1132, 1146 (D.C. Cir. 1980) (noting that FERC considers "all factors bearing on the public interest"). This includes a comprehensive review of potential environmental impacts. See National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* As part of that review, FERC accepts public comment and, in most cases, issues an Environmental Impact Statement outlining its findings. See 42 U.S.C. § 4332(C).

b.     Construction and operation of natural gas pipelines also must be consistent with the federal Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*

i.     At the center of the Clean Air Act's regulatory scheme are the National Ambient Air Quality Standards (NAAQS) developed by the Environmental Protection Agency (EPA). These standards, which take years to develop, establish thresholds for known pollutants. JA02244; JA01549. To date, EPA has issued NAAQS for six air pollutants: sulfur dioxide, particulate matter, nitrogen dioxide, carbon monoxide, ozone, and lead. See 40 C.F.R. pt. 50.

6

EPA designs the NAAQS to be protective of human health "with an adequate margin of safety." 42 U.S.C. § 7409. To that end, EPA identifies "the maximum airborne concentration of a pollutant that the public health can tolerate," and then decreases that "concentration to provide an 'adequate' margin of safety." *Whitman v. American Trucking Associations*, 531 U.S. 457, 465 (2001). To find a threshold genuinely protective of public health, EPA specifically focuses on at-risk populations such as "children, the elderly and individuals suffering from respiratory diseases." JA02927; JA01549. As a result, the NAAQS "inherently take certain environmental justice factors into account as part of the standard-setting process." EPA, *Plan EJ 2014 Legal Tools*, at 8 (Dec. 2011), https://www.epa.gov/sites/production/files/2015-04/documents/planej2014legaltools.pdf.

ii.    The Clean Air Act also distinguishes between "major sources" and "minor sources" of pollution and provides different standards for their review. See 42 U.S.C. § 7479 (defining major sources in the compressor station category as those "emit[ting] two hundred and fifty tons per year or more of any air pollutant"). Most relevant here, new major sources must undergo review at least as stringent as

the statute's "Prevention of Significant Deterioration" (PSD)

requirements, 42 U.S.C. §§ 7470–7492, which mandate use of the "best

available control technology"—an emission limitation based on the

maximum degree of reduction of pollutants emitted from the facility, 42

U.S.C. § 7479(3).[2] By contrast, minor sources are not subject to PSD

(and therefore, a "best available control technology") review under the

Clean Air Act. 42 U.S.C. § 7410(a)(2)(C).

     d.     Although the NAAQS are established by EPA, the Clean Air

Act vests primary responsibility for implementing them with the States,

42 U.S.C. § 7410, which must develop "implementation plans" to meet

air quality compliance measures within their borders. To obtain EPA

approval, a State must:

- create a permitting program for new and existing sources of air
  pollution, 42 U.S.C. § 7410(a)(2);

---

[2] The PSD requirements technically apply only to major sources outside nonattainment areas, defined as those that "do[] not meet . . . the national primary or secondary ambient air quality standard for [a given] pollutant." 42 U.S.C. § 7407(d)(1)(A)(i). In nonattainment areas, new major sources must adhere to EPA's more stringent criteria for "Nonattainment New Source Review." 42 U.S.C. §§ 7501–7515. These stricter standards include a requirement that the source adhere to the "Lowest Achievable Emission Rate" and that it offer an equivalent or greater reduction in pollution from an existing source as an offset for emissions generated by the new source. 42 U.S.C. §§ 7503(a), (c).

8

- classify every area within state borders as "attainment," "nonattainment," or "unclassifiable," with respect to each of the six regulated pollutants, 42 U.S.C. § 7407(d);

- include provisions sufficient to prevent any emissions activity that will "contribute significantly to nonattainment in" that State or in any other. 42 U.S.C. § 7410(a)(2)(D)(i)(I); and

- maintain certain standards for "major sources" of air pollution, 42 U.S.C. § 7475.

2.    For the States, the Clean Air Act represents a regulatory floor, not a ceiling. In fact, federal law expressly acknowledges that, subject to certain limits, States retain authority to develop and enforce more protective standards. See 42 U.S.C. § 7416.

a.    Virginia law vests responsibility for policing air quality in the Virginia Air Pollution Control Board (Board). Va. Code § 10.1-1301; see Va. Code Ann. §§ 10.1-1301 *et seq.* Per state regulations, the Board may (and often does) delegate its authority to issue permits for pollutant-emitting facilities to the Department of Environmental Quality (DEQ). See 9 Va. Admin. Code § 5-80-5(C) (defining "Board" as DEQ unless the Board considers the permit directly); Va. Code Ann.

9

§ 10.1-1322 (indicating that "permits may be issued, amended, revoked or terminated and reissued by" DEQ). Where a project has "the potential" to generate "public interest," however, the Board may vote to review the permit directly. 9 Va. Admin. Code § 5-80-25(D) (noting that the Board may review a petition directly where "there is a significant public interest" or where "requesters raise substantial, disputed issues"). In such circumstances, the Board, not DEQ, makes the final determination about whether to accept, modify, or reject the proposed permit. See 9 Va. Admin. Code § 5-80-5(C) (defining "Board" to mean the members of the Board when the Board votes to consider a permit directly); Va. Code Ann. §§ 10.1-1322.01(N), (P) (noting that "[a]fter the close of the public hearing comment period, the Board shall . . . take final action on the permit").

b.      When the Board makes permitting decisions, it is governed by regulations that differ in material respects from federal regulations. Though not required by federal law, Virginia law subjects both major and minor sources to a "best available control technology" review "to determine if the emissions units will be designed, built and equipped to comply with all applicable standards of performance." 9 Va. Admin.

10

Code § 5-80-1190 (noting also that minor sources must comply with all

§ 5-50 requirements); § 5-50-260. For minor sources, that review

requires the Board to establish "an emission limitation" "based on the

maximum degree of emission reduction . . . [the board] . . . determines is

achievable" for a "stationary source," § 5-50-250, "through the

application of production processes or available methods, systems and

techniques, including fuel cleaning or treatment or innovative fuel

combustion techniques for control of such pollutant," § 5-50-250(C). The

regulations define "stationary source" as "any building, structure,

facility or installation that emits or may emit any regulated air

pollutant." § 5-80-1110(C). And they define the "affected facilities at

stationary sources" as the "emissions units" that require a permit. § 5-

50-240. The Board makes its ultimate determination about the

"achievable" limitations for a given source "on a case-by-case basis,

taking into account energy, environmental and economic impacts and

other costs." § 5-50-250(C).

Before approving a permit, the Board must determine that the

pollutant-emitting source is compliant in all respects with the

regulations described above, as well as "all standards of performance." 9

11

Va. Admin. Code § 5-80-1180(A)(1). The Board must further confirm that the source "operate[s] in conformance with any applicable control strategy, including any emission standards or emission limitations, in the implementation plan in effect at the time," and does not "prevent or interfere with the attainment or maintenance of any applicable ambient air quality standard." § 5-80-1180(A)(3). Meeting these standards is a continuing obligation: Failure to adhere to the terms of an issued permit can result in revocation, suspension, enforcement action by the Board, and/or civil charges and penalties. § 5-80-1210.

c.    Beyond these baseline requirements, Virginia law imposes a variety of other obligations on the Board when it makes permitting decisions. The Board must consider all "facts and circumstances relevant to the reasonableness of the activity involved and the regulations proposed to control it." Va. Code Ann. § 10.1-1307(E) (the Section 1307(E) factors). The required considerations specifically "includ[e]":

- "The character and degree of injury to, or interference with, safety, health, or the reasonable use of property which is caused or threatened to be caused";

12

- "The social and economic value of the activity involved";

- "The suitability of the activity to the area in which it is located"; and

- "The scientific and economic practicality of reducing or eliminating the discharge resulting from such activity."

Va. Code Ann. §§ 10.1-1307(E)(1)–(4). In addition, the Virginia Energy Plan (which is also codified by statute), specifically instructs the Board to:

(1) ensure "the availability of affordable natural gas" while also;

(2) ensuring that the "development of new . . . facilities does not have a disproportionate adverse impact on economically disadvantaged or minority communities." Va. Code Ann. §§ 67-102(5), (11).

3.    Layered atop these state and federal regimes are local land use regulations, which dictate the permissible uses of local property. See, *e.g.*, Va. Code Ann. §§ 15.2-2200 *et seq.* Virginia law specifically provides that no application for Board approval "shall be considered complete" without confirmation from local authorities that the proposed use satisfies local land use standards. § 10.1-1321.1(A).

13

B.    Factual Background

1.    The Atlantic Coast Pipeline is an interstate natural gas pipeline intended to carry natural gas from West Virginia to the eastern portions of Virginia and North Carolina.[3] JA00042. Atlantic Coast Pipeline, LLC (Atlantic) proposes to construct three compressor stations, which use pressure to propel gas through the pipeline to its intended destination. JA00044. After a lengthy process, Atlantic selected Buckingham County, Virginia—specifically, an area near Union Hill—as the proposed site for one of the three compressor stations. JA02310; JA02317–18. Although Atlantic also identified an alternate site located about 1.9 miles away, JA02523, that site would have required the construction of an additional mile of pipeline. JA02523; JA02327.

2.    As required by federal law, Atlantic first sought approval for the compressor station from FERC, which reviewed more than 2,245 public comments—including comments from the petitioners in this case,

---

[3] Following this Court's decision in *Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150 (4th Cir. 2018), Atlantic halted ongoing construction of the pipeline, Kevin Ridder, *Pipeline Legal Disputes Escalate*, The Appalachian Voice, June 7, 2019, http://appvoices.org/2019/06/07/pipeline-legal-disputes-escalate/.

14

see FERC EIS at Z-i; *id.* at Z-1131–Z-1141; *id.* at Z-2145–Z-2157.

Having done so, FERC issued an 866-page Environmental Impact

Statement finding no impacts to health, air quality, noise, or

socioeconomic and environmental justice that would warrant rejecting

or altering Atlantic's proposal (even without the stringent conditions

ultimately imposed by the Board). See FERC, *Atlantic Coast Pipeline*

*and Supply Header Project: Final Environmental Impact Statement*

(2017) ("FERC EIS"), at ES-13–ES-17,

https://www.ferc.gov/industries/gas/enviro/eis/2017/07-21-17-

FEIS/volume-I.pdf.[4]

   In making this determination, FERC acknowledged that the

proposed site was located within a low-income environmental justice

community. FERC EIS at App. U-2. But FERC determined that "no

disproportionately high and adverse impacts on environmental justice

populations as a result of air quality impacts . . . would be expected." *Id.*

at App. U-2; FERC EIS at 4-513–15. FERC further concluded that the

---

[4] See also *Atlantic Coast Pipeline, LLC*, 161 FERC ¶ 61,042, ¶¶
257, 271, 274, 325 (2017) (agreeing with these conclusions); *Atlantic
Coast Pipeline, LLC*, 164 FERC ¶ 61,100, ¶¶ 210, 301–20 (2018)
(reaffirming these cultural impact, environmental justice, health, and
air quality conclusions on rehearing).

15

facility would not threaten the Union Hill area through either significant noise or substantial disruption of the area's cultural landscape, FERC EIS at 4-538, 4-571, and that the proposed location was preferable to the alternative site because it would not require construction of an additional mile of pipeline, FERC EIS at 3-58.

FERC also specifically addressed the possibility of using an electric powered turbine instead of a natural gas turbine at the Buckingham station, but found that such a change "would not offer a significant environmental advantage." FERC EIS at 3-60. As FERC explained, making the switch would require construction of 12 miles of new electrical power lines (as well as a new substation facility) and would result in a higher load on existing electrical facilities—all of which would increase overall emissions. *Id.* at 3-60. FERC further noted that electricity would be a less reliable source than natural gas, which would naturally flow through the pipeline. *Id.*

3.    With the federal process underway, Atlantic next sought zoning approval from the Buckingham County Board of Supervisors (the County). After an extensive review involving its own public comment period, JA02981; see, *e.g.*, JA00309, the County issued a

16

special use permit allowing Atlantic to construct and operate the
compressor station on the relevant parcel, JA00323–29.

4.      Having obtained federal and local approvals, Atlantic next
applied for a "minor source" permit from the Board, as required by the
Clean Air Act. See 42 U.S.C. § 7661a(b); 9 Va. Admin. Code § 5-80-
1120.[5] Given the public interest in the matter, the Director of the Board
submitted the permit directly to the Board for consideration, rather
than delegating this authority to DEQ. JA02949–51; see 9 Va. Admin.
Code §§ 5-80-5(C), 5-80-25(C).

a.      Starting in August 2017, DEQ worked to establish a set of
permit conditions to recommend to the Board. JA02214; see also
JA00035 (initial application). After significant "back and forth" with
Atlantic, DEQ developed a draft permit in August 2018. JA02214–15.

i.      DEQ's draft permit included emission limits for five EPA-

---

[5] Because the Buckingham station will have an uncontrolled
emissions rate of, at most, 43 tons of particulate matter (an EPA-
regulated pollutant), it qualifies as a "minor" rather than a "major"
source under federal and state standards. 42 U.S.C. § 7479(1)
(establishing 250 tons as threshold for major sources in this category); 9
Va. Admin. Code § 5-80-1615(C) (same). The Board calculated this
"uncontrolled emissions rate" using the highest possible one-hour
emissions rate multiplied by the number of hours in a one-year period.
JA01552.

17

regulated pollutants (nitrogen oxides, carbon monoxide, volatile organic compounds, inhalable particulate matter (PM10), and fine particulate matter (PM2.5)) as well as two state-regulated toxins (formaldehyde and hexane). JA02217; see JA01324. For all other potential air pollutants, the "uncontrolled emissions rate"—DEQ's estimate of worst case emissions without any regulation—fell below the applicable exemption thresholds for minor sources, obviating the need for further review. JA02216; 9 Va. Admin. Code §§ 5-80-1105(C), 5-60-300.

ii.      For the five pollutants and two toxins that met the relevant thresholds, DEQ conducted a review of the "best available control technology" to determine the appropriate permit limits. See JA00330; JA02216. For most minor source permits, DEQ looks to similar Virginia sources to determine the maximum "achievable" rate. JA02887. In this case, however, DEQ went further, extending its review to all similar projects across the country. JA02887; see generally JA00330.[6]

---

[6] For major source PSD permits, EPA recommends, but does not require, a five step "top down" approach to best available control technology review. *In re Prairie State Generating Co.*, 13 E.A.D. 1, 2006 WL 2847225, at *11 (E.A.B. 2006) (citation omitted) ("This top-down analysis is not a mandatory methodology, but it is frequently used by permitting authorities to ensure that a defensible [best available control technology] determination, involving consideration of all requisite

Having conducted this review, DEQ recommended several control technologies to reduce emissions at the Buckingham station. These included: (i) a dry low-NOx combustion system and selective catalytic reduction to reduce nitrogen oxides; (ii) an oxidation catalyst system to reduce carbon monoxide and volatile organic compounds; (iii) inlet air filtering and good combustion practices to reduce particulate matter; (iv) cold weather control logic to minimize emissions when inlet air temperature is less than 0°F; (v) limited venting (including "blowdown" or "pigging") events; (vi) capped emergency testing; and (vii) several other work practice standards. JA02989–91; JA02960–63.

The technological requirements imposed through this review resulted in emission limits well below those imposed on other compressor stations across the country. JA02901. For example:

- Most turbines contain no control limits for nitrogen oxide emissions, with actual emissions sometimes totaling 15 parts per million. JA02889. In contrast, the Buckingham station

statutory and regulatory criteria, is reached."). Although the compressor station at issue here is not a "major source," DEQ followed a similar but slightly modified version of this approach. See JA02217–30.

19

permit limits nitrogen oxides to 3.75 parts per million.
JA02889.

- Most Virginia turbines have uncontrolled carbon monoxide
  emissions of 25 parts per million and volatile organic compound
  emissions of 5 parts per million. JA02889. For the Buckingham
  station, DEQ recommended an achievable emissions rate of 2
  parts per million for carbon monoxide and 1.25 parts per
  million for volatile organic compounds. JA02889.

Due to these restrictive thresholds, the Buckingham station will
be the most stringently regulated of all three of the Atlantic Coast
Pipeline compressor stations. JA02900; JA01551. Indeed, the
Buckingham station will operate with the lowest standards for nitrogen
oxides, carbon monoxide, volatile organic compounds, and natural gas
venting *in the Nation*. JA01553; see JA02901 ("Emissions limits in the
proposed permit are the lowest for any natural gas compressor turbines
in the country."). These limits represent the total allowable emissions in
a given year, not the actual emissions the project will ultimately
produce. JA02281. Consequently, "[t]he project will use technology
normally found on much larger compressor stations with much higher

levels of emissions, and controls [that] go well beyond those [typically] imposed on minor sources." JA01387.

During the initial public comment period, some members of the public suggested that the compressor station use electric turbines in lieu of the natural gas turbines proposed by Atlantic. JA02178. DEQ disagreed with the suggestion that the "best available control technology" requirement mandated that option. As DEQ explained, the "wholesale replacement of a natural gas turbine (the affected emission unit) for an electric turbine (a completely different process unit with a different energy source) constitutes redefinition of the source and is not considered in Virginia's [best available control technology] determination." JA02178; see also JA02264–65; JA01550–51 ("Under [best available control technology], emissions levels in a permit are based on the review of the maximum reductions achievable *for a particular type of source*.") (emphasis added). DEQ also stated that whereas "[n]atural gas . . . provides a consistent source of fuel [because] the pipeline operation provides the fuel needed," "[e]lectricity would be subject to grid issues such as power outages and other similar interruptions that would hamper operations at the site." JA02178.

iii.    In addition to its best available control technology analysis, DEQ also conducted "extensive" air quality modeling to determine the impact of the Buckingham station on the surrounding air. JA02214, JA01797. This modeling employed conservative assumptions to estimate the worst-case emissions under the worst-case conditions using the control technologies identified above. JA02902, JA01551. For example, when developing the baseline concentration of air pollutants, DEQ used areas with higher populations and emissions than those in Buckingham County. JA02231; see also JA02502 ("Buckingham has . . . at least 24% less emissions than the sites that we selected for our background concentration."). DEQ's analysis also assumed peak emissions at all times, JA02232, and worst-case conditions (such as zero degree temperatures) at all times. JA01281–82; see also JA02291.

As the chart below summarizes, DEQ found that even under these worst-case conditions, emissions from the Buckingham station would not come close to violating any applicable national or state air quality standard. JA02902, JA01551. To the contrary, the worst-case emissions remained 21 to 98 percent below those thresholds, which are themselves

designed to contain a "margin of safety." 42 U.S.C. § 7412; *Whitman v. American Trucking Associations*, 531 U.S. 458, 465 (2001).

| Pollutant | Total Worst Case Air Quality Concentration (ug/m³)[7] | NAAQS (ug/m³) | Percentage of Threshold |
|---|---|---|---|
| Nitrogen oxides | 1-Hour: 117.2<br><br>Annual: 20.4 | 1-Hour: 188<br><br>Annual: 100 | 1-Hour: 62.3%<br><br>Annual: 20.4% |
| Carbon monoxide | 1-Hour: 1677<br><br>8-Hour: 1382 | 1-Hour: 40,000<br><br>8-Hour: 10,000 | 1-Hour: 4.2%<br><br>8-Hour: 13.8% |
| Inhalable particulate matter (PM10) | 24-Hour: 36.1 | 24-Hour: 150 | 24-Hour: 24.1% |
| Fine particulate matter (PM2.5) | 24-Hour: 21.6<br><br>Annual: 8.7 | 24-Hour: 35<br><br>Annual: 12 | 24-Hour: 61.7%<br><br>Annual: 72.5% |
| Pollutant | Total Worst Case Air Quality Concentration (ug/m³) | State Standards (ug/m³) | Percentage of Threshold |
| Formaldehyde | 1-Hour (100% Load): 38.9<br><br>1-Hour (Startup): 40.5<br><br>Annual (100% Load): .076 | 1-Hour: 62.5<br><br>Annual: 2.4 | 1-Hour (100% Load): 62.2%<br><br>1-Hour (Startup): 64.8%<br><br>Annual (100% Load): 3.2% |
| Hexane | 1-Hour (Pigging): 6,897<br><br>1-Hour (Blowdown): 4,518<br><br>1-Hour (Normal): 20 | 1-Hour: 8,800 | 1-Hour (Pigging): 78.4%<br><br>1-Hour (Blowdown): 51.3%<br><br>1-Hour (Normal): 0.2% |

JA02902.

---

[7] ug/m³ stands for micrograms per cubic meter of air.

DEQ also determined that any emissions into the surrounding community would be even lower than those listed above. Peak emissions, DEQ concluded, would occur only at or near the station's fence line, which must stand at least 100 feet back from the property line according to the local land use permit. JA02503; JA00326. At the property line, impacts were "at least 58% lower," and for most pollutants were "80 to 90% lower." JA02504. See also JA02154 (response to comments).

iv.     Beyond its control technology and air quality reviews, DEQ officials also visited the proposed site to evaluate its suitability for the compressor station. JA00861. DEQ noted that the area was "sparsely populated," surrounded by forest, and located several miles from the nearest school or hospital. JA00861. Though not required to do so for minor sources, DEQ also held an initial meeting to give members of the public an opportunity to ask questions before the close of the comment period. JA02214. DEQ ultimately received more than 5,300 comments on the proposed permit, JA01554, which it summarized and responded to in a document made available to the public as well as to the Board. See JA02146.

b.    With DEQ's record in hand, the Board conducted four public meetings about the proposed compressor station.

i.    The Board's first public meeting was on November 8, 2018. During that meeting, the Board received extensive comments from interested members of the community. See JA01542.

ii.    During the Board's second public meeting on November 9, DEQ presented a summary of its analysis and findings, as well as a synopsis of its responses to the written comments received. See JA02202. With respect to the statutory factors set forth in Virginia Code § 10.1-1307(E), see pp. 12–13, *supra,* DEQ noted that it had considered potential health impacts (as required by subsection 1) by conducting "worst-case air modeling for the proposed compressor station which demonstrated that its emissions would not result in any exceedances of health-based air quality standards." JA02252. As to consideration of both the social and economic value of the project and the proposed site's suitability (required by subsections 2 and 3), DEQ pointed to the local land use permit as evidence that local officials had "thoroughly examined the proposed project and determined it complied with all local ordinances and other requirements." JA02252–53. DEQ

26

stated, however, that it did not interpret the statute to permit consideration of factors other than "clean air." JA02252–53. Finally, DEQ stated that it had considered the "scientific and economic practicality of reducing or eliminating the discharge" (required by subsection 4) through its best available control technology review. JA02252.

Several members of the Board pressed DEQ on its limited understanding of the statutory requirement to consider site suitability, particularly in light of concerns from the public regarding environmental justice. For example, one Board member stated that she was "very interested to know how" DEQ had "accounted for" "the proposed location of the compressor station," "environmental justice," and "cultural resources." JA02333; see also JA02302–04.

After a brief discussion, Member Moreno moved to table the permitting decision to give the Board additional time to consider these subjects. JA02343–44. In addition, Member Rovner specifically stated that she "ha[d] a broader understanding of environmental justice than some of what [she had] heard articulated at this meeting" and believed that the Board "ha[d] a duty to consider the question of disproportionate

27

impact." JA02344–45. Member Rovner further stated that while "a lot of what [the Board had] heard . . . was relevant to that question," the Board did not have "a complete answer to the question of whether there is disproportionate impact" based on the record then before it. JA02344–45. "[I]n order to have a complete answer to that question," Member Rovner stated that "[the Board] need[ed] more demographic information than [it] ha[d] been given about this community" and urged DEQ to provide that information before the next meeting. JA02344–45. Several other Board members expressed agreement, and the full Board voted to approve the motion for additional time to receive and consider information on the site suitability question. JA02345–46, 48; JA02349.

After the November 9 meeting, DEQ, Atlantic, and the Southern Environmental Law Center (SELC) submitted additional documents to the Board. See JA02581. These documents included the results of an Environmental Justice Screening Tool, a door-to-door site survey submitted by SELC, and excerpts from FERC's environmental justice analysis, including Atlantic's proposed alterative site. See JA02581. SELC also submitted a letter indicating that DEQ's screening tool provided only an estimate of the nearby population, whereas the door-

to-door survey conclusively showed that 83.4% of those surveyed in Union Hill identified as nonwhite. JA02393–94.

iii.    After considering this new demographic information, the Board held a third public meeting in December 2018. At that meeting, DEQ gave a presentation specific to the site suitability question. DEQ explained that, in addition to the local permit, it had considered FERC's analysis of alternatives and cultural resources; Union Hill's unsuccessful request for status as a Rural Historic District; and the absence of other sources of emissions in the area. JA02513–14. DEQ also provided a thorough summary of FERC's findings, JA02521–28, and specifically discussed potential environmental justice concerns, explaining that "no data indicate the proposed compressor station would impose any disproportionate adverse environmental impacts on the surrounding area when compared to Virginia as a whole." JA02546.

At the close of the December meeting, the Board voted to approve two amendments to the permit designed to strengthen its monitoring requirements. JA02566–67; see also JA02354 (redline of draft permit); JA02567 (noting that the amendments made the "permit a good bit more strict"). And, given the new information provided by DEQ at that

29

meeting, the Board voted to again delay its final decision to give the public an opportunity to comment once more, specifically on the site suitability issue. JA02486–89.

iii.    Following a final review of the comments received during this second public comment period, the Board convened for its fourth and final public meeting on January 8, 2019. See JA02889. DEQ gave another presentation, emphasizing that the air in communities around the proposed station would remain among the cleanest in Virginia. JA02906; JA02913 (noting that, even with the compressor station, Union Hill's air would remain "better than that breathed by the vast majority of Virginians"). On the basis of the record presented, DEQ officially recommended that the Board approve the permit as amended at the prior meeting. JA02907–08.

Before issuing their decision, several Board members made oral statements explaining their reasons for voting to approve the permit. Members indicated that they had fully considered comments made by the public, and had "assumed" for purposes of their evaluation that the area around the proposed station constituted an environmental justice community, or, at minimum, what the EPA refers to as a "hot spot"—"a

30

smaller concentrat[ion] of minority population that might be [a]ffected."
JA02923–24; see also JA02947 ("I have considered the data on both
sides and have assumed that the community at issue is an
environmental justice community."). One member mentioned "visit[ing]
the site to see it for" herself to "put into context what [members of the
public had] told [her] in [the] comments." JA02947. That same member
reiterated that she had "considered" the "comments on all issues,
including site suitability." JA02947. Another member stated that he
had done independent research on the environmental issues affecting
minority and low income communities and had found that, even with
the compressor station, the air in Union Hill would "continue[] to be
some of the cleanest air in . . . Virginia." JA02930. Specifically
discussing the issue of disproportionate impact, the Chair added that he
had "spent many, many hours looking at the details of this." JA02924–
25. At the conclusion of the January 8 meeting, the Board unanimously
voted to issue the permit. JA02999.[8]

_____

[8] Although only four members of the Board participated in the
final decision, they voted 4–0 to approve the permit. JA02949–51. Thus,
even if two other Board members whose terms had expired had
participated and voted against approval, the outcome would have been
the same.

31

The Board's decision approving the permit incorporated a memorandum prepared by DEQ, DEQ's engineering analysis, DEQ's response to public comment, and an outline of possible amendments. JA02999; see JA01727–2193 ("Board book" containing incorporated documents). As part of its final written decision, however, the Board also reiterated that it did "not adopt any legal views expressed by [DEQ] regarding the Board's authority under Va. Code Section 10.1-1307(E)." JA02999.

The final permit also contains a number of monitoring requirements on top of the emission limitations previously described. See JA02955. Among other things, the permit requires continuous monitoring for emissions of nitrogen oxides, and monitoring of volatile organic compounds and carbon monoxide, JA02904; JA02904–05; JA02551; ambient air monitoring for nitrogen dioxide, fine particulate matter, and volatile organic compounds, JA02905; a quarterly leak detection review, requiring a survey, walk-through, and the use of an optical gas engine camera, JA02223–24; and daily walk-throughs, JA02223–24.

## SUMMARY OF ARGUMENT

The State Air Pollution Control Board (Board) engaged in a thorough review before determining that the Buckingham compressor station would not violate applicable state and federal standards. The Board conducted almost a year-and-a-half of study, held four separate public meetings with two rounds of public notice and comment, specifically requested additional information on environmental justice and site suitability, engaged in a rigorous review of the best available control technology, conducted extensive air quality modeling of worst-case emissions, and considered more than 5,300 public comments. In addition, the Board's decision to approve the permit came only after both federal and local regulators had evaluated and approved the proposed site, the facility's design, and the potential environmental impacts of the permitted activity, even without the many conditions later imposed by the Board. JA02177.

Petitioners argue that the Board acted arbitrarily by failing to consider an electric motor alternative as part of its "best available control technology" review and by failing to adequately consider the

33

site's suitability in light of the unique features of the Union Hill community. Both contentions fail.

1.    Petitioners' first argument rests on the claim that the Board borrowed EPA's "redefinition of the source" doctrine and applied it (incorrectly) to a minor source permit. That argument falters at the outset: Rather than misapplying an EPA doctrine, the Board correctly interpreted its *own* regulations as not calling for consideration of an electric motor alternative. As the agency concluded, electric motors constitute a different emission source, not a type of "control technology," and thus are not a proper component of the "best available control technology" review for minor sources in Virginia. 9 Va. Admin. Code § 5-50-260(C). Far from being a required part of the state review process, a substitution of the emission unit under consideration for a different type of emission unit would require the relevant agencies at all three levels (federal, state, and local) to start their permitting processes anew. In addition, a contrary interpretation would turn the regulatory scheme on its head, resulting in a more stringent review for minor sources than for major sources.

Even if the relevant regulations were ambiguous—and they are not—the Board's interpretation in this complex and technical area warrants judicial deference. In *Kisor v. Wilkie*, 139 S.Ct. 2400, 2413 (2019), the Supreme Court reaffirmed that agency interpretations are entitled to deference, provided that they are reasonable, are rendered in an official forum on an issue upon which the agency has significant expertise, and represent the agency's considered view. The Board's conclusion that Virginia regulations do not require consideration of alternative sources as part of the "best available technology review" satisfies all of those standards.

2.    Petitioners offer a variety of arguments about why the Board did not adequately "consider" "[t]he suitability of the activity to the area in which it is located." Va. Code Ann. §§ 10.1-1307(E) & (E)(3). But the record shows that the Board fully assessed the potential for disproportionate impacts on the minority community in Union Hill, twice delaying its decision and reopening public comment specifically to gather information on that very subject. That reasonable minds could disagree with the Board's ultimate conclusion does not make its decisionmaking process arbitrary or unlawful.

35

## STANDARD OF REVIEW

When reviewing previous challenges to state permitting decisions, this Court has applied the arbitrary-and-capricious standard of review from the federal Administrative Procedure Act (APA), 5 U.S.C. §§ 505 *et seq.* See, *e.g.*, *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019); *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 403 (4th Cir. 2018).[9]

Under that standard, an agency must have examined "the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice

---

[9] Petitioners ask this Court to apply the APA's standard of review here as well. As the Third Circuit has explained, the APA "does not cover state agencies." *Delaware Riverkeeper Network v. Secretary of the Pa. Dep't of Envtl. Prot.*, 870 F.3d 171, 179 n.8 (3d Cir. 2017); see also 5 U.S.C. § 701 (defining "agency" for purposes of the APA as any "authority of the Government of the United States"). Were this issue governed by Virginia law, the Board's decision would be reviewed for substantial evidence, Va. Code Ann. § 2.2-4027 (2017), which permits "the reviewing court [to] reject an agency's factual findings only when, on consideration of the entire record, a reasonable mind would necessarily reach a different conclusion." *Alliance to Save the Mattaponi v. Commonwealth Dep't of Envtl. Quality*, 621 S.E.2d 78, 88 (Va. 2005). But, as in *Appalachian Voices* and *Sierra Club*, the Court need not resolve whether the APA standard applies in this context because "[p]etitioners' claims fail even under their preferred standard." *Sierra Club*, 898 F.3d at 403 n.13; accord *Appalachian Voices*, 912 F.3d at 753 n.1.

36

made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). Judicial review is "highly deferential, with a presumption in favor of finding the agency action valid," *Appalachian Voices*, 912 F.3d at 753 (citation omitted), particularly "in matters involving not just simple findings of fact but complex predictions based on special expertise," *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (quotation marks and citation omitted). A court "may not use review of an agency's environmental analysis as a guise for second-guessing substantive decisions committed to the discretion of the agency." *Ohio Valley Envtl. Coal., Inc. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 129 (4th Cir. 2013) (quotation marks and citation omitted). And, as the Supreme Court recently affirmed, an agency's interpretation of its regulations is entitled to deference. *Kisor v. Wilkie*, 139 S.Ct. 2400, 2413 (2019); accord *Horne v. Commonwealth Real Estate Bd.*, 705 S.E.2d 535, 539 (Va. Ct. App. 2011) (emphasizing that, under Virginia's state law analogue to the APA, courts must accord "great deference to an agency's interpretation of its own regulations") (citation omitted).

37

## ARGUMENT

## I.   In granting the challenged permit, the Board was not required to consider use of electric motors in lieu of natural gas turbines

Petitioners' first challenge boils down to a claim that the Board improperly applied EPA's "redefinition of the source" doctrine when it declined to reconsider FERC's conclusions about the use of electric motors in lieu of natural gas turbines. Cf. pp. 16–17, *supra*. But that is not what the Board did in this case. Rather than applying an EPA doctrine, the Board simply interpreted its own regulations as not requiring consideration of an alternative that would effect a "wholesale replacement" of the emission units (*i.e.* the sources of power generation) for the Buckingham station. JA02178, JA02237–38. That interpretation is compelled by the text of the applicable Virginia regulations and supported by the broader regulatory scheme. And even if the regulations were ambiguous, the Board's interpretation would be entitled to deference under the Supreme Court's decisions in *Auer v. Robbins*, 519 U.S. 452 (1997), and *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

### A.  Virginia regulations establish that the Board need not consider alternative emission sources as part of its "best available control technology" review

1. As previously explained, Virginia law requires that both minor and major sources of potential air pollution undergo a "best available control technology" review "to determine if the *emissions units*" at a proposed facility "will be designed, built and equipped to comply with all applicable standards of performance." 9 Va. Admin. Code § 5-80-1190 (emphasis added); see pp. 8, 10–11, *supra*, (noting that the federal Clean Air Act requires such review only for major sources). In fulfilling that requirement, the Board must establish "an emission limitation" "based on the maximum degree of emission reduction . . . the board determines is achievable for the new stationary source or project through the application of production processes or available methods, systems and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant." 9 Va. Admin. Code § 5-50-250. Virginia regulations, in turn, define "stationary source" as "any building, structure, facility or installation that emits or may emit any regulated air pollutant," § 5-80-1110(C), and state that no person may discharge pollutants from any

39

"*emissions units*" in "excess of emissions limitations representing best available control technology," § 5-50-260 (emphasis added); see § 5-50-240 (defining "affected facilities" as the "emissions units that are subject to the new source review program").

a.    Read together, these regulations require application of "the best available control technology" (*i.e.,* "production processes[,] . . . methods, systems [or] techniques,") to any "emissions units" in a "new stationary source or project" (*i.e.* the structure "that emits or may emit any regulated air pollutant"). But the regulations do not contemplate a change in the *type* of "emissions unit" used by the stationary source— only a change in the "processes," "methods," or "techniques" applied to that emission unit to control the pollutants it emits.

The natural gas turbines proposed by Atlantic are properly characterized as "emissions units" under Virginia regulations. See JA02178 (referring to Atlantic's natural gas turbine as "the affected emission unit"). Likewise, electric turbines are not "processes," "methods," or "techniques" that can be applied to natural gas turbines to control pollutants, and thus cannot be deemed "control technology" subject to the Board's review.

40

DEQ captured the distinction in response to public comments. Under the regulations, it explained, regulators "can require [Atlantic] to make alterations to [its] system, like, say, adding catalytic reduction . . . [But] [r]eplacing a natural gas-fired turbine with an electric turbine is a wholesale replacement, and it's inappropriate."[10] JA02237–38. Or, as DEQ explained in a document adopted by the Board, "wholesale replacement of a natural gas turbine (the affected emission unit) for an electric turbine (a completely different process unit with a different energy source) constitutes redefinition of the source and is not considered in Virginia's [best available control technology] determination." JA02178; see also JA02178 (noting that "an electric turbine . . . [is] a completely different process unit" than a natural gas turbine);[11] JA01550–51 ("Under [best available control technology], emission levels in a permit are based on the review of the maximum

---

[10] In contrast, the Clean Air Act *does* require consideration of alternatives in nonattainment areas. See 42 U.S.C. § 7475.

[11] Although this explanation comes from the DEQ's response to public comment, the Board incorporated this document into its own final decision statement at the close of the process. JA02999.

41

reductions achievable *for a particular type of source*.") (emphasis added).[12]

b.    The Board's conclusion that Virginia law did not require it to consider a wholesale change in the underlying emissions units is reinforced by a second portion of the applicable regulation. That provision instructs the Board to consider "emission control efficiencies achieved *in the industry for the source type*." 9 Va. Admin. Code § 5-50-250 (emphasis added). But electric power compression and natural gas compression are entirely different "source types," and it would make little sense to compare the two. See JA02177–78. As DEQ explained, "you wouldn't compare a cost effectiveness value for landfills to cost effectiveness for an electric generator. . . . [Y]ou'd stay within that source category." JA02269; see also 9 Va. Admin. Code § 5-80-1190(1)(a) (noting that the purpose of the "control technology review" is to

---

[12] In this respect, the Board's decision is in line with *Snyder v. Pennsylvania*, No. 2015-027-L, 2015 WL 9590755, at *7 (Pa. Envtl. Hr'g Bd. Dec. 21, 2015), where a court stated that it was "not convinced that it is even appropriate to be looking at federal jurisprudence regarding" best available control technology when reviewing a state permitting decision. As here, the challenge in *Snyder* involved review of the *state's* definition of that term, which differed in material respects from the federal definition. *Id.* at *7 ("There are . . . significant differences in the Pennsylvania definition of source and the federal definition.").

42

determine "if *the emissions units* will be designed, built and equipped to comply with all applicable standards of performance") (emphasis added).

c. Petitioners' contrary interpretation would produce substantial inefficiencies and regulatory oddities. For one thing, if Atlantic were to change its emission units to electric motors, all three of the relevant agencies would be forced to start their permitting processes anew because each reviewed—and ultimately authorized—a natural gas turbine, not an electric one. See *Atlantic Coast Pipeline, LLC*, 161 FERC ¶ 61,042, ¶¶ 8, 325–26 (2017) (identifying the natural gas-fired Buckingham compressor station as one of the facilities reviewed and granting certificate of public convenience and necessity); JA00324 (including as a condition of local special land use permit that "compression of natural gas will occur *through natural gas fueled turbines* with no greater than a combined 55,000 ISO horsepower rating") (emphasis added); JA02959 (permitting use of natural gas turbines). If Atlantic chose a new emission source, it would thus need a new authorization from each of the relevant agencies.

43

But that is not the end of it. All parties here agree that, in the context of major source permits, the Board need not consider options that "redefine" the applicable source. See Pet. Br. 27. Petitioners nonetheless argue (at 27–28) that the Board must consider those same options for minor source permits because the "redefining the source" doctrine does not apply in that context. Thus, according to petitioners, state regulators must conduct a *more* intensive review for minor source permits than for major source permits—even though the Clean Air Act (unsurprisingly) imposes more restrictive conditions on review of major sources. Compare 42 U.S.C. § 7475(a), with 42 U.S.C. § 7410(a)(2)(C). Such a result would flip the regulatory scheme on its head.

2.      Petitioners next argue that swapping natural gas turbines for electric motors would not in fact "redefine the source" as the EPA understands that term (Pet. Br. 31–37). As a threshold matter, any such claim is irrelevant because the question here involves the meaning of Virginia state regulations rather than any statute or regulation EPA administers.[13]

---

[13] For the reasons just explained, petitioners err in asserting (at 29) that "[t]here is no statutory basis for limiting" the Board's analysis to "the applicant's proposed design." The statutory basis comes directly

44

At any rate, petitioners find no support in cases interpreting the EPA-administered doctrine. In the two out-of-circuit decisions that petitioners cite, the courts *agreed with the agency* that the challengers' preferred alternative would impermissibly redefine the source. In *Sierra Club v. EPA*, 499 F.3d 653 (7th Cir. 2007), for example, the Seventh Circuit stated that EPA need not consider fuel sources that would, as a practical matter, require the facility to "undergo significant modifications." *Id.* at 654. And in *Helping Hand Tools v. EPA*, 848 F.3d 1185, 1189, 1197 (9th Cir. 2016), the Ninth Circuit concluded that review of alternative fuel sources was not required—even though the facility had the cleaner fuel on site— because the applicant's primary purpose was to burn excess lumber. *Id.*

What is more, petitioners ask this Court to go even further than the unsuccessful challengers in *Sierra Club v. EPA*. In that case,

---

from the state statute and regulations in question. And the differences between the federal and state definitions do not negate or limit the Board's ability to interpret its own state regulations. Compare 42 U.S.C. § 7475(a) (applying control technology to "any major emitting facility"), and 42 U.S.C. § 7475(a)(4) (noting that "the proposed facility is subject to the best available control technology"), with 9 Va. Admin. Code § 5-50-250 (applying control technology to the "new stationary source or project"), and 9 Va. Admin. Code § 5-50-260 (noting that a "new stationary source shall apply best available control technology" for pollutants emitted by "any affected emissions unit").

45

petitioners asked the EPA to consider the possibility of importing "cleaner" coal at a mine-mouth coal plant that had been designed to process "dirtier" coal from a nearby coal mine. 499 F.3d at 654. There was no question that there was an available "control technology" (a cleaner fuel) that would allow the relevant "emissions unit" (a coal processing plant) to reduce its pollution footprint; the only question was whether doing so would require "significant modifications" to the plant's design, such as elimination of a conveyer belt intended to transport coal from the nearby mine. *Id.* at 655.

Here, in contrast, petitioners seek not just a "cleaner" fuel, but an altogether different kind of emissions unit. See *In re Prairie State Generating Co.*, 2006 WL 2847225, at *13 (E.A.B. 2006) (distinguishing between proposals for "'redefining' the Facility" and consideration of "'alternatives' to the Facility," such as "alternative power sources" like "wind or solar"). Even with a redesign, natural gas turbines simply cannot process electricity. Petitioners' proposed change thus goes well beyond the change considered and rejected by the Seventh Circuit in *Sierra Club v. EPA.*

46

But even if this case raised the question of whether petitioners'
proposal would require the compressor station to undergo "significant
modifications" (and it does not), the answer would be "yes." For one
thing, the design of an electric motor turbine is inherently different
from that of a natural gas turbine (because they are different kinds of
turbines). For another, as FERC found, use of an electric motor here
would require the construction of 12 miles of new overhead power lines,
plus a new substation to support the added load. See FERC EIS, at 3-
60. That is at least as significant as the elimination of a half-mile long
conveyer belt rejected in *Sierra Club v. EPA*.

Nor are petitioners correct that Atlantic's ability to "move gas
through a pipeline" (Pet. Br. 36) ends the inquiry. That argument
proves too much. If petitioners were correct, the cases on which they
rely would have come out the other way because, in each, the applicants
could have achieved their desired energy outcome even with the
proposed cleaner fuel source. See, *e.g.*, *Sierra Club v. EPA*, 499 F.3d at
656 ("The petitioners pitch their case on the naked proposition that if a
plant is capable—with redesign—of burning a clean fuel, it must
undergo a 'best available control technology' analysis."); *Helping Hand*

*Tools*, 848 F.3d at 1197 (noting that the EPA "[is] not required to take on the 'Sisyphean' task of considering every possible clean fuel alternative").[14] Indeed, if "purpose" were defined as broadly as petitioners propose, the Board would be required to consider *any* alternatives to a proposed emission source so long as the new source would still generate energy. See *Sierra Club v. EPA*, 499 F.3d at 655 ("[N]uclear fuel is clean, and so the implication, one might think, is that the agency could order Prairie State to redesign its plant as a nuclear plant rather than a coal-fired one, or could order it to explore the possibility of damming the Mississippi to generate hydroelectric power,

---

[14] See also *Sierra Club v. Moser*, 310 P.3d 360 (Kan. 2013) (not arbitrary or capricious for state agency not to consider integrated gasification combined cycle or natural gas instead of coal); *Powder River Basin Res. Council v. Wyoming Dep't of Envt'l. Quality*, 226 P.3d 809 (Wyo. 2010) (no clear error in state authority finding that changing proposed coal-fired power plant's boiler from "subcritical" to "supercritical" would redefine the source); *In re City of Palmdale (Palmdale Hybrid Power Project)*, 15 E.A.D. 700 (E.A.B. 2012) (no clear error in determination that changing hybrid natural gas-solar plant to use only solar energy would redefine the source); *In re Russell City Energy Ctr., LLC*, 15 E.A.D. 1 (E.A.B. 2010) (permitting entity did not abuse discretion in refusing to consider dry cooling rather than wet cooling because dry cooling would redefine the source); *In re SEI Birchwood, Inc.*, 5 E.A.D. 25 (E.A.B. 1994) (no clear error in refusing to consider natural gas instead of coal for Virginia power plant because it would redefine the source).

or to replace coal-fired boilers with wind turbines."). No statute or regulation requires the Board to undergo such a "Sisyphean labor." *Id.*

## B.    The Board's interpretation of its regulations is entitled to deference

Even if the regulations were ambiguous—and they are not—the Board's interpretation would be entitled to deference. As the Supreme Court recently reiterated, an agency's interpretation of its own regulations is entitled to deference provided that certain conditions are met—namely, (1) the interpretation must be reasonable, (2) it must be rendered in an official forum on an issue upon which the agency has significant expertise, and (3) it must represent the considered view of the agency, rather than a convenient litigating position or post-hoc rationalization. See *Kisor*, 139 S. Ct. at 2414–18. All of those conditions are met here.

1.    For the reasons just described, the Board's interpretation of the regulations is eminently reasonable. To the extent there is a "zone of ambiguity" created by the regulation, it is clear that the Board's interpretation that it need not consider alternative stationary sources "come[s] within [it]." *Kisor*, 139 S. Ct. at 2415–16.

49

2.    The Board's interpretation also "implicate[s] its substantive expertise." *Kisor*, 139 S. Ct. at 2416. As both the Ninth and Seventh Circuits have concluded in the context of the federal PSD permitting regime, "[r]efining the statutory definition of 'control technology' . . . to exclude redesign is the kind of judgment by an administrative agency to which a reviewing court should defer." *Sierra Club v. EPA*, 499 F.3d at 655; see also *Helping Hand Tools*, 848 F.3d at 1198 ("Drawing the line between control technology and redefining the source is a technical determination to which a court should defer to EPA.").

3.    Finally, the Board's "reading of [the] rule . . . reflect[s] [its] fair and considered judgment." *Kisor,* 139 S. Ct. at 2417 (internal quotation marks omitted). As described above, DEQ fully explained in its report and response to public comments why the regulations do not permit "wholesale replacement" of an energy source pursuant to the "best available control technology review," JA02178; see also JA02264–65; JA01550–51, and the Board adopted that portion of DEQ's recommendation in its decision approving the permit. Demonstrating unequivocally that the Board considered DEQ's interpretation before adopting it, the Board explicitly declined to adopt other conclusions

50

offered by DEQ. JA02999 (noting that the Board did "not adopt any

legal views expressed by [DEQ] regarding the Board's authority under

Va. Code Section 10.1-1307(E)"). Hence, far from a "convenient

litigating position" or "post hoc rationalization," the Board's

interpretation of the applicable regulations guided its analysis

throughout the permitting process.

In these circumstances, deference to the Board's interpretation of

Virginia's regulations "enables the agency to fill out the regulatory

scheme [the Legislature] has placed under its supervision." *Kisor*, 139

S. Ct. at 2418. Accordingly, to the extent there is ambiguity in the

regulations, this Court should defer to the Board's reading.

## II.  The Board fully considered the Section 10.1-1307 factors

In granting the challenged permit, the Board more than satisfied

its obligation to "consider" specific factors listed in Virginia law, as well

as all other relevant "facts and circumstances." Va. Code Ann. § 10.1-

1307(E).

1.     With respect to the first statutory factor—"[t]he character

and degree of injury to, or interference with, safety, health, or the

reasonable use of property which is caused or threatened to be caused,"

51

Va. Code Ann. § 10.1-1307(E)(1)—the Board adopted DEQ's conservative air quality modeling to ensure that the station would not emit pollutants at or near the relevant health-based state and federal standards. JA02913; JA02981; JA02999. As to the second statutory factor—"[t]he social and economic value of the activity involved," Va. Code Ann. § 10.1-1307(E)(2)—the Board heard from several members of the Atlantic consortium and the public at-large about the social and economic benefits of the pipeline project. See, *e.g.*, JA02934–36, 43. And as to the fourth factor— "[t]he scientific and economic practicality of reducing or eliminating the discharge resulting from such activity," Va. Code Ann. § 10.1-1307(E)(4)—the Board adopted the emission limits proposed by DEQ following its review of the "best available control technology." JA02981.

Petitioners dispute none of this. Instead, they limit their arbitrary-and-capriciousness challenge to the third factor—"[t]he suitability of the activity to the area in which it is located." Va. Code Ann. § 10.1-1307(E)(3). But on that issue, we share some important points of agreement: Petitioners argue—and we agree—that the Virginia Energy Plan, Va. Code Ann. § 67-102, read alongside the

52

review factors in Section 10.1-1307(E), is best understood as requiring the Board to consider the potential for disproportionate impacts to minority and low income communities. The only disagreement, therefore, is whether the Board satisfied this duty. It did.

Indeed, to that end, the Board conducted an extensive review process, including review of numerous oral and written public comments, JA02915–17, JA02919; a specific request for additional demographic and site information, JA02947; JA02344–45; review of a second wave of public comment limited to this subject alone, JA02896; review of FERC's site suitability and environmental justice conclusions, JA02521–28; consideration of local approvals, JA02938; and a review of DEQ's air quality analysis, Atlantic's alternative site, and the physical features of the property, see JA01727; JA02581. Critically, as several Board members noted just before the final vote, the Board also considered the potential for disproportionate impacts to the environmental justice community in Union Hill. JA02933 (Chairman Langford); JA02947 (Member Moreno); JA02344–45 (Member Rovner).

2.    Petitioners assert four deficiencies in the Board's consideration of site suitability: (a) failure to consider health risks;

(b) exclusive reliance on the NAAQS; (c) refusal to make demographic findings about the area; and (d) failure to require a pre-decisional health assessment. Pet. Br. 39–40. All fall short.

a.    The record amply demonstrates that the Board considered potential health risks, including the risk to vulnerable populations. Indeed, one Board member explained that she had specifically requested and considered "an analysis on whether there may be any disproportionate adverse impacts on the affected community." JA02947. The Chair likewise discussed the potential for disproportionate impacts on the minority community in Union Hill, JA02923–33, explaining that his review of the data suggested "a low probability of a disproportionate adverse impact," in part because his own "back yard ha[d] higher levels" of pollutants than Union Hill would have with the compressor station, JA02933; see also JA02930.

The Board also incorporated DEQ's "extensive modeling to determine compliance with the health standards that apply." JA02214. These standards are specifically designed to protect the health of sensitive populations. JA02927; JA01549; see also EPA, *Plan EJ 2014 Legal Tools*, at 8. And this air quality modeling—which itself employed

54

conservative assumptions designed to over-estimate actual emissions—showed rates well within health-based standards, with even greater reductions on the property line and beyond. JA02503–04; JA00326.

b.      Petitioners' second argument rests on a misperception of the Board's decision. Contrary to petitioners' assertion (Pet Br. 43–46), the Board did not find that compliance with NAAQS (or local zoning laws) always equates to site suitability. Quite the contrary: The Board specifically *rejected* DEQ's initial site suitability analysis precisely because it had not considered the demographics of the area and the potential for disproportionate impacts. See JA02344–45. And the Board only approved the permit after collecting data on area demographics and soliciting a new round of public comment on that subject. Eliminating any room for doubt, the Board announced in its final decision that it "d[id] not adopt any legal views expressed by [DEQ] regarding the Board's authority under Va. Code Section 10.1-1307(E)." JA02999.

c.      Petitioners are correct that the Board did not make any specific findings with respect to the demographics of the area. But the record also shows why: because members of the Board assumed that the

55

area was an "environmental justice community" and proceeded to analyze the issue accordingly. JA02923–24, JA02947. The Board thus found that, even assuming petitioners' version of the facts to be true, the permitted activity was reasonable in light of the many air quality protections imposed on the station.

d.    Petitioners' final challenge to the site suitability assessment also fails. Contrary to petitioners' claim, the Board had no need, obligation, or even ability to conduct a full pre-decisional health assessment. As described above, EPA spends years developing NAAQS to protect the public health with an appropriate margin of safety, and DEQ's modeling made clear that the air in Union Hill and thereabouts would remain well within these health-based standards. See pp. 22–25, *supra*. The Board thus had ample basis to conclude that the permitted activity was reasonable even without a pre-decisional health assessment.[15]

---

[15] Although it was not obligated to conduct such an assessment before its decision, the Board did request a full health assessment from the Virginia Health Department. JA02914, JA02947. That assessment, which may take years to complete, could form the basis for an action to revoke the permit if the station fails to comply with permit limits. But it was not arbitrary to approve the permit on the basis of the information before the Board at the time.

\* \* \*

Far from engaging in arbitrary or lawless action, the Board carefully reviewed this important minor source permit, including the impact the proposed compressor station will have on the surrounding community. The Board considered all of the relevant factors and more than 5,300 comments from the community, ultimately approving a permit that satisfied all applicable regulatory standards and imposed more stringent conditions than any other of its kind. 9 Va. Admin. Code § 5-80-1180; JA02999. The Board's decision on that score falls comfortably within the bounds of its discretion. The fact that others may have reached a different conclusion does not make any part of the Board's process arbitrary and capricious or contrary to law.

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,

STATE AIR POLLUTION CONTROL
BOARD, *et al.*


By:     *s/ Brittany M. Jones*
        Brittany M. Jones
        *John Marshall Fellow*

Mark R. Herring
  *Attorney General*

Toby J. Heytens
  *Solicitor General*

Michelle S. Kallen
  *Deputy Solicitor General*

Martine E. Cicconi
  *Deputy Solicitor General-Designate*
  *(Pending Admission to Va. Bar)*

Donald D. Anderson
  *Deputy Attorney General*

Paul Kugelman
  *Senior Assistant Attorney*
  *General/Section Chief*

202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7773 – Telephone
(804) 371-0200 – Facsimile
SolicitorGeneral@oag.state.va.us

58

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary to resolve this case. The record makes clear that the Virginia State Air Pollution Control Board carefully considered the issues associated with the issuance of the challenged permit and that its decision was not arbitrary and capricious.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 10,517 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii), according to the count of Microsoft Word.

## CERTIFICATE OF SERVICE

I certify that on August 16, 2019, I electronically filed the

foregoing brief with the Clerk of this Court by using the appellate

CM/ECF system.  The participants in the case are registered CM/ECF

users and service will be accomplished by the appellate CM/ECF

system.

*s/  Brittany M. Jones*
Brittany M. Jones