No. 19-1152

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

FRIENDS OF BUCKINGHAM; CHESAPEAKE BAY FOUNDATION, INC.,
*Petitioners*,

v.

STATE AIR POLLUTION CONTROL BOARD; RICHARD D. LANGFORD,
Chair of the State Air Pollution Control Board; VIRGINIA DEPARTMENT OF
ENVIRONMENTAL QUALITY; DAVID K. PAYLOR, Director, Virginia
Department of Environmental Quality,
*Respondents*,

and

ATLANTIC COAST PIPELINE, LLC,
*Intervenor.*

---

On Petition for Review of Approval and Issuance of Stationary Source Permit
No. 21599 by the State Air Pollution Control Board and the Virginia Department of
Environmental Quality

---

### PETITIONERS' REPLY BRIEF

---

David L. Neal
SOUTHERN ENVIRONMENTAL LAW CENTER
601 West Rosemary St., Suite 220
Chapel Hill, NC 27516
(919) 967-1450
dneal@selcnc.org

Gregory Buppert
SOUTHERN ENVIRONMENTAL LAW CENTER
201 West Main St., Suite 14
Charlottesville, VA 22902
(434) 977-4090

*Counsel for Friends of Buckingham*

*Additional counsel listed inside front cover*

Jon A. Mueller
Margaret L. Sanner
CHESAPEAKE BAY FOUNDATION, INC.
6 Herndon Avenue
Annapolis, MD 21403
(443) 482-2162
jmueller@cbf.org

*Counsel for Chesapeake Bay Foundation, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ..............................................................................1

SUMMARY OF ARGUMENT ............................................................1

STANDARD OF REVIEW ................................................................4

ARGUMENT .....................................................................................5

I.    THE STATE AGENCIES' DECISION NOT TO CONSIDER
      ELECTRIC MOTORS AS ZERO-EMISSION ALTERNATIVES TO
      GAS-FIRED TURBINES FINDS NO SUPPORT IN VIRGINIA
      LAW ........................................................................................5

      A.    The "Redefining the Source" Doctrine Appears Nowhere in
            Virginia Laws, Regulations, or Guidance .............................6

      B.    Far From Precluding Their Consideration, Virginia's
            Regulations Require Consideration of Available "Methods,
            Systems and Techniques" to Control Pollution ...................8

      C.    The Board's Erroneous Interpretation of an Unambiguous
            Regulation and Reliance on a Previously Unannounced
            Doctrine Merit No Deference .............................................13

      D.    Even if Virginia Law Provided a Basis for the State Agencies'
            Decision Not to Consider Electric Motors, Their Conclusion
            That Using Electric Motors Would "Redefine the Source"
            Lacked a Rational Explanation ...........................................14

      E.    Atlantic's Claim That the State Agencies Considered and
            Rejected Electric Motors Is Contradicted by the Record and by
            the State Agencies Themselves ..........................................16

i

II.    THE STATE AGENCIES VIOLATED VIRGINIA CODE SECTION
       10.1-1307(E) BY FAILING TO CONSIDER THE COMPRESSOR
       STATION'S DISPROPORTIONATE HEALTH IMPACTS ON THE
       UNION HILL COMMUNITY AND THE SUITABILITY OF THE
       SITE ...................................................................................................18

       A.    The Court Should Rely on the Board's Written Decision—and
             the DEQ Documents the Board Incorporated Into That
             Decision—to Review Compliance With Section 10.1-1307(E) .........18

       B.    Respondents Ignore the Board's Obligation to Resolve
             Conflicting Information in the Record .................................................23

       C.    Respondents Fail to Address the State Agencies' Undue
             Reliance on an Improper County Zoning Decision ...........................27

III.   THERE IS NO DISPUTE ABOUT THE BOARD'S ROLE AS
       DECISION-MAKER FOR THIS PERMIT ...................................................28

CONCLUSION ...................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Federal and State Cases**

*AES Sparrows Point LNG v. Wilson*,
  589 F.3d 721 (4th Cir. 2009) ................................................4

*Am. Trucking Ass'ns v. Fed. Highway Admin.*,
  51 F.3d 405 (4th Cir. 1995) ................................................8

*Appalachian Voices v. State Air Pollution Control Bd.*,
  693 S.E.2d 295 (Va. Ct. App. 2010) ................................4

*Auer v. Robbins*,
  519 U.S. 452 (1997) ................................................13

*Avante at Roanoke v. Finnerty*,
  692 S.E.2d 277 (Va. Ct. App. 2010) ................................13

*Brandon v. Nat'l Credit Union Ass'n*,
  115 F. Supp. 3d 678 (E.D. Va. 2015) ................................11

*Cardsoft, LLC v. Verifone, Inc.*,
  807 F.3d 1346 (Fed. Cir. 2015) ................................28

*Carroll v. Town of Rockport*,
  837 A.2d 148 (Me. 2003) ................................................21

*Christensen v. Harris Cty.*,
  529 U.S. 576 (2000) ................................................13

*Cowpasture River Pres. Ass'n v. Forest Serv.*,
  911 F.3d 150 (4th Cir. 2018) ................................12, 17

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015) ................................27

*Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot.*,
  833 F.3d 360 (3d Cir. 2016) ................................4

*Dominion Transmission, Inc. v. Summers*,
  723 F.3d 238 (D.C. Cir. 2013) ................................4

*Genuine Parts Co. v. EPA*,
 890 F.3d 304 (D.C. Cir. 2018)......................................................24, 27

*GTE S., Inc. v. Morrison*,
 199 F.3d 733 (4th Cir. 1999) ................................................................5

*Helping Hand Tools v. EPA*,
 848 F.3d 1185 (9th Cir. 2016) ......................................................15, 16

*Islander E. Pipeline Co. v. Conn. Dep't of Envtl. Prot.*,
 482 F.3d 79 (2d Cir. 2006) ..................................................................4

*Kisor v. Wilkie*,
 139 S. Ct. 2400 (2019)..............................................................13, 14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..........................................................19, 20, 23

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*,
 677 F.3d 596 (4th Cir. 2012) ...............................................................8

*Portland Audubon Soc'y v. Endangered Species Comm.*,
 984 F.2d 1534 (9th Cir. 1993) ...........................................................21

*Sierra Club v. EPA*,
 499 F.3d 653 (7th Cir. 2007) .............................................................14

*Sierra Club v. U.S. Dep't of the Interior*,
 899 F.3d 260 (4th Cir. 2018) .....................................11, 15, 23, 24, 25

*United States v. Akzo Coatings of Am., Inc.*,
 949 F.2d 1409 (6th Cir. 1991) ...........................................................11

*Wright v. Kan. State Bd. of Educ.*,
 268 P.3d 1231 (Kan. Ct. App. 2012) .................................................21

**Administrative Cases**

*In re Prairie State Generating Co.*,
 13 E.A.D. 1, 2006 WL 2847225 (EAB 2006), *aff'd sub nom. Sierra Club v. EPA*, 499 F.3d 653 (7th Cir. 2007) ...................................7, 15, 16

**Statutes**

42 U.S.C. § 7475(a)(4) ...................................................................7, 10

42 U.S.C. § 7479(3) ............................................................................6

Va. Code § 2.2-4027 ...........................................................................5

Va. Code § 10.1-1307(E)(4) ...............................................................8

Va. Code § 10.1-1322.01(P) .............................................................21

**Regulations**

9 Va. Admin. Code § 5-10-20 ...........................................................28

9 Va. Admin. Code § 5-50-250(C) .........................................9, 10, 17

9 Va. Admin. Code § 5-80-5(C) ........................................................28

9 Va. Admin. Code § 5-80-1110(C) ....................................................9

**Other Authorities**

EPA, National Ambient Air Quality Standards for Particulate Matter,
    78 Fed. Reg. 3086 (Jan. 15, 2013) .............................................26

Fed. R. App. P. 28(a)(8)(A) ..............................................................28

Fed. R. App. P. 28(b) ........................................................................28

## INTRODUCTION

Petitioners Friends of Buckingham and Chesapeake Bay Foundation ask the Court to provide the people of Union Hill with the full protection of Virginia's air pollution control laws. The Virginia Air Pollution Control Board's ("Board's") decision to allow a compressor station for the Atlantic Coast Pipeline ("ACP") in the historic, predominantly African-American Union Hill community fell short of those protections. On their behalf, Petitioners seek a best available control technology determination that meets the terms of Virginia's regulations and evaluates the use of zero-emission electric motors to drive the compressors in place of polluting gas-fired turbines. Petitioners seek actual consideration of the demographic, health, and related site-suitability factors required under Virginia law rather than a decision that ignores those factors. Because Respondents have not adequately defended the legal flaws in the Board's decision, the permit should be vacated and remanded to the Board.

## SUMMARY OF ARGUMENT

The State Agency respondents ("State Agencies") and intervenor Atlantic Coast Pipeline, LLC ("Atlantic") (collectively, "Respondents") devote much of their briefs to aspects of the permitting decision not challenged by Petitioners. Those uncontested issues should not distract from the questions at the heart of this case: First, do Virginia's applicable best available control technology regulations

require *consideration* of electric motors as an available zero-emission technology? Second, did the Board err by adopting the Virginia Department of Environmental Quality's ("DEQ's") site-suitability conclusions in the Board's decision, which predated the comment period on those Section 10.1-1307(E) factors?  The Court should answer yes to both questions and remand the permit to the Board for further consideration.

With regard to the first issue, Respondents' briefs make clear where the parties agree.  Under the cooperative-federalism structure of the Clean Air Act, Virginia is free to enact stricter requirements for its minor new source review program in its state implementation plan than otherwise required by federal law. Under its approved plan, Virginia requires a best available control technology ("BACT") determination for facilities like the Buckingham compressor station ("Compressor Station").  It would be error to use the U.S. Environmental Protection Agency's ("EPA's") "redefining the source" doctrine as part of the Buckingham Compressor Station BACT determination because EPA's doctrine is specific to the Prevention of Significant Deterioration ("PSD") program, which is not applicable here.

The parties disagree, however, on how the Board handled its permit review. The State Agencies argue that they relied on a previously unknown Virginia-specific "redefining the source" doctrine—rather than the inapplicable EPA

2

doctrine of the same name—in order to avoid consideration of zero-emission electric motors to power the compressors.  The Court should reject this *post hoc* argument because there is no ambiguity in the applicable BACT regulation and no support for the existence of a Virginia-specific doctrine in the record or Respondents' briefs.  Absent the improper use of the EPA doctrine, the Board had no reason not to consider zero-emission electric compressors, which would eliminate much of the air pollution that otherwise threatens the people of Union Hill.

With regard to the second issue, Respondents conflate what is in the administrative record with what the Board incorporated into its final decision.  It is the decision of the Board, not comments received from the public or musings of individual Board members, that is before this Court.  And with regard to the statutory site-suitability and health factors, that decision was based entirely on DEQ's response to comments and engineering analysis.  The only aspects of the Board's decision that encompassed the statutory site-suitability and health factors did not in any way consider the demographics or disproportionate health issues raised during the December comment period.  Instead, the Board adopted DEQ's conclusions that were finalized before the November 2018 Board meeting and before the Board extended the permitting process to accept public input on those critical Section 10.1-1307(E) factors.  The Board's decision thus failed to address

and resolve the conflicting information about demographics and disproportionate health impacts submitted during the second comment period.

## STANDARD OF REVIEW

Atlantic urges the Court to diverge from the consistent practice of this and other courts of appeals and apply a standard of review from Virginia law rather than the arbitrary and capricious standard of the federal Administrative Procedure Act ("APA").  Atlantic Br. 27-29.  But as the State Agencies acknowledge, this Court has applied the APA standard under nearly identical circumstances:  review of state agency actions taken pursuant to federal law for facilities regulated under the Natural Gas Act.  *See* State Br. 36 (citing cases); *see also AES Sparrows Point LNG v. Wilson*, 589 F.3d 721, 727 (4th Cir. 2009).  So, too, have other circuits.  *See Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot.*, 833 F.3d 360, 377 (3d Cir. 2016); *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 243 (D.C. Cir. 2013); *Islander E. Pipeline Co. v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 94-95 (2d Cir. 2006).  Atlantic identifies nothing unique about this case that warrants departing from the courts' consistent practice.

In any event, the issue is of little import.  Even under the Virginia Administrative Process Act, "[q]uestions of law are reviewed *de novo.*" *Appalachian Voices v. State Air Pollution Control Bd.*, 693 S.E.2d 295, 298 (Va. Ct. App. 2010).  Factual findings are reviewed under the "substantial evidence"

standard, Va. Code § 2.2-4027, which is not meaningfully different from the arbitrary and capricious standard with respect to fact finding. *GTE S., Inc. v. Morrison*, 199 F.3d 733, 745 n.5 (4th Cir. 1999).

## ARGUMENT

## I.    THE STATE AGENCIES' DECISION NOT TO CONSIDER ELECTRIC MOTORS AS ZERO-EMISSION ALTERNATIVES TO GAS-FIRED TURBINES FINDS NO SUPPORT IN VIRGINIA LAW.

The Board was presented with a zero-emission alternative to power the Compressor Station's compressors, but summarily rejected it as "redefining the source"—invoking an EPA doctrine all parties agree is inapplicable to the Board's BACT determination for this permit.  Now, Respondents' chief argument in defense of the Board's failure to consider electric compressors is that the Board relied on Virginia's previously unknown  "redefining the source" doctrine, which is purportedly distinct from EPA's doctrine of the same name.  State Br. 39-43; Atlantic Br. 35-36.

This argument suffers from two fundamental flaws.  First, Respondents offer no evidence of the prior existence of a Virginia-specific redefining the source doctrine, let alone one with the same name as the inapplicable EPA doctrine. Respondents' argument is merely an attempt to justify the State Agencies' erroneous application of EPA's redefining the source doctrine with a *post hoc* rationalization.  Second, even if this Court were to find that a Virginia-specific

redefining the source doctrine existed, the State Agencies failed to undertake any analysis to determine whether using electric motors would constitute redefining the source.

### A. The "Redefining the Source" Doctrine Appears Nowhere in Virginia Laws, Regulations, or Guidance.

There is no evidence that Virginia has developed a minor source specific "redefining the source" doctrine that is unrelated to or independent of EPA's doctrine of the same name. The State Agencies claim that they used a BACT analysis for the Compressor Station that is a "similar but slightly modified version" of EPA's BACT approach, State Br. 19 (citing JA02217-30), but at no point did DEQ describe how it "modified" EPA's approach to the redefining the source doctrine. Indeed, the State Agencies point to no law, regulation, guidance, or case referring to such a Virginia-specific doctrine. This absence is critical. Without any prior articulation of this doctrine, it is difficult to accept the State Agencies' arguments—joined by Atlantic—that an independent Virginia doctrine drove this decision, rather than an improper application of the EPA doctrine. *See* State Br. 39-43; Atlantic Br. 36-37.

EPA developed the redefining the source doctrine in the PSD program to solve a specific statutory ambiguity found in the Clean Air Act: the tension between the broad requirements of "best available control technology," 42 U.S.C. § 7479(3), and the directive to apply that BACT determination to the applicant's

"*proposed* facility," 42 U.S.C. § 7475(a)(4).  *In re Prairie State Generating Co.*, 13 E.A.D. 1, 2006 WL 2847225, at *16 (EAB 2006) (noting that EPA's redefining the source doctrine was developed to harmonize the competing obligations in the PSD statute), *aff'd sub nom. Sierra Club v. EPA*, 499 F.3d 653 (7th Cir. 2007). Respondents have identified no equivalent ambiguity or conflict in the Virginia regulations that would require the adoption of a similar doctrine here.

The language used by DEQ during the administrative process—language adopted by the Board—makes clear that the agency was improperly applying EPA's doctrine.  DEQ described "redefining the source" in a manner consistent with the inapplicable EPA doctrine for PSD permits, with a focus on deferring to the applicant's *proposed* facility.  *See* Nov. 9, 2018 Hearing Transcript 36:22-37:3 (JA02237-38) ("Businesses have to be able to determine the activity that they're doing and how they're going to do it.").  The Board adopted DEQ's decision to defer to the emissions units "proposed by the source."  Decision Statement ¶ 2 (JA02999) (adopting response to comments); Response to Comments 33 (JA02178).  And in practice, Atlantic followed the top-down BACT analysis used in PSD permitting, including a citation to EPA's 1990 NSR Guidance, which also contains EPA's description of the redefining the source doctrine.  Final Permit Application (JA00998).

Given the absence of any record evidence supporting the prior existence of a Virginia-specific doctrine, the State Agencies' argument, joined by Atlantic, appears instead to be a convenient litigation position—not the actual position taken by the Board below.  Courts judge agency action solely on the grounds invoked by the agency at the time of agency action, not on *post hoc* rationalizations in litigation.  *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 604 (4th Cir. 2012).  This Court should look skeptically at the State Agencies' claim that the Board relied on a previously unarticulated Virginia-specific doctrine sharing the same name as an EPA doctrine that all parties agree is not applicable to the permit.  *See, e.g.*, *Am. Trucking Ass'ns v. Fed. Highway Admin.*, 51 F.3d 405, 410 (4th Cir. 1995) (holding that agencies' claimed statutory interpretation advanced on appeal played no part in their decision-making process below).  Without the inappropriate use of EPA's doctrine, the Board offered no reason for declining to consider zero-emission electric compressors in its BACT determination.

## B.    Far From Precluding Their Consideration, Virginia's Regulations *Require* Consideration of Available "Methods, Systems and Techniques" to Control Pollution.

The plain-language requirements governing BACT determinations are clear: the Board must consider "scientific and economic practicality of reducing or eliminating" on-site air pollution.  Va. Code § 10.1-1307(E)(4).  And in reviewing an application for a new stationary source permit, the State Agencies are required

to consider "the maximum degree of emission reduction for any pollutant" that they determine "is achievable … through the application of production processes or available methods, systems and techniques … for control of such pollutant." 9 Va. Admin. Code § 5-50-250(C).  Absent the redefining the source doctrine, DEQ—in a decision adopted by the Board—offered no other legal basis for declining to consider electric motors as an "available method" for control of pollution from the Compressor Station's compressors.  Response to Comments 33 (JA02178).

The State Agencies are wrong to argue that Virginia's minor source regulations "compelled" the conclusion that they did not have to consider electric motors.  State Br. 38.  The State Agencies' argument turns on their narrow characterization of the relevant "emissions unit" as "[t]he natural gas turbines proposed by Atlantic."  *Id.* at 40.  Virginia regulations define "emissions unit" as "any part of a stationary source which emits or would have the potential to emit any regulated air pollutant."  9 Va. Admin. Code § 5-80-1110(C).  But without citing any authority, the State Agencies categorize the "emissions units" as natural gas turbines, rather than compressors.  *See* State Br. 40; JA02178.  Through this sleight of hand, the State Agencies can argue that "electric turbines are not 'processes,' 'methods,' or 'techniques' that can be applied to natural gas turbines to control pollutants" and thus are not subject to their review.  State Br. 40.  But

9

electric turbines *are* "methods, systems [or] techniques" that can be applied to *compressors* to control pollutants—and such available methods, systems, or techniques must be considered. 9 Va. Admin. Code § 5-50-250(C). By arbitrarily restricting their analysis without explanation, the State Agencies would eviscerate Virginia's BACT requirement.

Even if the relevant "emissions units" were properly defined as the natural gas turbines—which they are not—the State Agencies offered no basis for further limiting their analysis to "[t]he natural gas turbines *proposed by Atlantic*." State Br. 40. As discussed above, the focus on an applicant's "proposed facility" under the federal PSD law, *see* 42 U.S.C. § 7475(a)(4), has no analogue in Virginia's regulations. Instead, the requirements of a BACT determination under Virginia law are broad and unambiguous: The Board must consider emissions reductions "based on the maximum degree of emission reduction for any pollutant which would be emitted from a new stationary source or project." 9 Va. Admin. Code § 5-50-250(C).

Given the availability of electric compressors as a zero-emission technology, it is unsurprising that Atlantic and its lead partner, Dominion Energy, have considered or used electric motors at other compressor stations. Pets. Br. 36-37. This uncontested fact is properly before the Court, contrary to Atlantic's contention (not joined by the State Agencies). *See* Atlantic Br. 38. A reviewing

10

court evaluating agency action on the administrative record "may consider additional evidence as either background information to aid the court's understanding, or to determine if the agency examined all relevant factors or adequately explained its decision." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1428 (6th Cir. 1991); *accord Brandon v. Nat'l Credit Union Ass'n*, 115 F. Supp. 3d 678, 684 (E.D. Va. 2015).  Petitioners' citations to publicly available government sources are intended to help the Court determine whether the State Agencies examined all relevant factors in making its BACT determination. For example, DEQ maintained that it compared "the relative level of control with other similar Virginia sources" (JA02989), yet it ignored the electric-motor-driven compressor at Dominion Energy's compressor station in Loudon County, Virginia. And Atlantic itself recognized that it could use electric motors in its permit application for the ACP's Mockingbird Hill compressor station, which DEQ expressly considered.  These documents highlight that the Board failed to examine all relevant factors.[1]

---

[1] The Court may also take judicial notice of Atlantic's Mockingbird Hill permit application, publicly available through the Federal Energy Regulatory Commission's ("FERC's") electronic library, where the fact that Atlantic submitted the application is not disputed.  *See Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 276 n.4 (4th Cir. 2018) (taking judicial notice of record publicly available on federal agency website).

The State Agencies' appeal to a separate provision directing the Board to consider "emission control efficiencies achieved *in the industry for the source type*" is not well-taken, as it directly conflicts with the position taken by DEQ during its review. *See* State Br. 42 (quoting 9 Va. Admin. Code § 5-50-250) (emphasis added by State Agencies). In their brief, the State Agencies claim that "electric power compression and natural gas compression are entirely different 'source types.'" State Br. 42. But during the permitting process, DEQ was clear that the relevant "source type" for its BACT analysis was a compressor station— not a particular type of compression. Response to Comments 32-33 (JA02177-78).

Finally, requiring consideration of electric motors as part of the BACT determination would not turn permitting "on its head." State Br. 43-44. The State Agencies had an independent obligation to review the air permit for the Compressor Station and statutory standards distinct from those applied by FERC or the Buckingham County Board of Supervisors. The State Agencies cannot be excused from their legal obligations based on the assumption that performing those obligations may require restarting other regulatory processes. In any event, the State Agencies' claim is unfounded; nothing in the record suggests that the Board's consideration of electric motors would have had any impact on FERC's completed environmental review for the ACP or Buckingham County's special use permit for the Compressor Station. *See, e.g.*, *Cowpasture River Pres. Ass'n v. Forest Serv.*,

12

911 F.3d 150 (4th Cir. 2018) (requiring Forest Service to consider alternatives other than the preferred route considered and adopted by FERC in its Environmental Impact Statement).

### C. The Board's Erroneous Interpretation of an Unambiguous Regulation and Reliance on a Previously Unannounced Doctrine Merit No Deference.

The Court need not take up the State Agencies' arguments regarding agency deference. *See* State Br. 49-51. Deference under *Auer v. Robbins*, 519 U.S. 452 (1997), to an agency's interpretation of its own regulation "can arise only if a regulation is genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019); *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000). If "there is only one reasonable construction of a regulation[,] then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense." *Kisor*, 139 S. Ct. at 2415.

No party argues that the underlying regulations are ambiguous. As explained in Section I.B, above, they are not. Where no ambiguity exists, "[t]o defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen*, 529 U.S. at 588; *see also Avante at Roanoke v. Finnerty*, 692 S.E.2d 277, 282-83 (Va. Ct. App. 2010) (quoting *Christensen* and citing cases under Virginia law).

13

Even if the regulation were ambiguous, no deference would be warranted. A "court should decline to defer to a merely 'convenient litigation position' or '*post hoc* rationalizatio[n] advanced' to 'defend past agency action against attack.'" *Kisor*, 139 S. Ct. at 2417. Neither DEQ nor the Board has previously made public an interpretation that a rule against "redefining the source" is an element of its minor source BACT determination. A central rationale for deferring to an agency's reasonable interpretation is "Congress's frequent 'preference for resolving interpretive issues by uniform administrative decision, rather than piecemeal by litigation.'" *Id.* at 2413. There is no evidence that the State Agencies' use of the redefining the source doctrine is part of a uniform agency decision; rather, it is the very kind of piecemeal approach that Congress and the courts have sought to avoid. The deference rule was not designed for *post hoc* interpretations like the State Agencies' position here. *See id.* at 2413-14.

**D.     Even if Virginia Law Provided a Basis for the State Agencies' Decision Not to Consider Electric Motors, Their Conclusion That Using Electric Motors Would "Redefine the Source" Lacked a Rational Explanation.**

The reason EPA adopted a redefining the source doctrine is to provide guidance to the agency (or state-level permit drafters implementing delegated PSD programs) on how to consider available pollution control technologies without altering the purpose of the applicant's "proposed" facility. *See, e.g.*, *Sierra Club*, 499 F.3d at 655. Absent agency guidance on a supposed Virginia-specific

redefining the source doctrine, it would be difficult—if not impossible—for any

reviewing court to evaluate the Board's decision.  That problem is compounded

here because the Board rested its decision on DEQ's response to comments, which

provided no analysis of whether the use of electric motors would in fact "redefine

the source."  Agencies cannot simply invoke the phrase "redefining the source" to

avoid consideration of available "methods, systems and techniques" for pollution

control.  A rational explanation must be given.  *Sierra Club v. U.S. Dep't of the*

*Interior*, 899 F.3d 260, 294 (4th Cir. 2018) (reversing agency permit decision

because agency failed to draw a "'rational connection between the facts found and

the choice made' and has ignored important aspects of the problem") (quoting

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S.

29, 43 (1983)).

Respondents misunderstand the relevance of the illustrative redefining the

source opinions cited in Petitioners' opening brief.  *See* Pets. Br. 34-35 (citing

*Helping Hand Tools v. U.S. EPA*, 848 F.3d 1185 (9th Cir. 2016) and *In re Prairie*

*State Generating Co.*, 2006 WL 2847225).  What is instructive about the *Helping*

*Hand* and *Prairie State* decisions is that the applicant's proposed facility in each

instance was designed to take advantage of a locally sourced fuel; the fuel source

was intrinsically linked to the purpose for building the facility in the first place;

and thus the potential use of an alternative fuel source would disrupt the

15

applicant's business purpose.  *See Helping Hand*, 848 F.3d at 1198; *In re Prairie State*, 2006 WL 2847225, at \*19.  There is nothing in the record here indicating that the use of gas-fired turbines, as opposed to electric motors, to power the compressors is an aspect of Atlantic's business purpose for the Compressor Station.

These cases are instructive for another reason.  They demonstrate the thoughtful analysis required before an agency or reviewing court can reasonably conclude that an available control technology need not be considered in a BACT determination because it would "redefine the source."  Such considered analysis is wholly lacking in the DEQ record adopted by the Board in reaching its decision. *See* Response to Comments 33 (JA02178).

### E. Atlantic's Claim That the State Agencies Considered and Rejected Electric Motors Is Contradicted by the Record and by the State Agencies Themselves.

Notwithstanding the State Agencies' insistence that they properly declined to consider electric motors, Atlantic suggests that DEQ evaluated and "properly rejected" electric motors.  Atlantic Br. 31-34.  Atlantic's argument is contradicted by the record and, unsurprisingly, not taken up by the State Agencies.

Throughout the permitting process, DEQ consistently said that it *did not* consider electric motors at all.  Corbett Email (JA01381); Response to Comments 33 (JA02178); Nov. 9, 2018 Hearing Transcript 36:22-25, 37:4-17 (JA02237-38).

16

The Board adopted DEQ's decision not to consider electric motors. Decision Statement ¶ 2 (JA02999). Disregarding this decision, Atlantic points to a single footnote in DEQ's response to comments as support for its claim that electric motors were fully considered and rejected by DEQ. Response to Comments 33 n.17 (JA02178). This one-sided, conclusory footnote, presented without any evidentiary support in the record, does not constitute a reasoned analysis of whether switching to electric motors would constitute redefining the source and is not an evaluation of electric motors as a viable pollution control technology for the Compressor Station. Aside from this footnote, Atlantic points only to *FERC's* review of electric motors as a potential alternative in its Environmental Impact Statement, as if FERC's review were itself part of DEQ's BACT analysis. Atlantic Br. 33. It was not.[2]

Further evidence that DEQ did not consider electric motors is the noticeable absence from the record of any comparison of the cost difference between deploying electric motors and gas turbines with control technology—a comparison that is required under Virginia law. *See* 9 Va. Admin. Code § 5-50-250(C) (BACT includes consideration of "cost effectiveness of the incremental emissions

---

[2] FERC's Environmental Impact Statement has no bearing on the Board's independent obligations under Virginia's approved Clean Air Act state implementation plan. *See, e.g.*, *Cowpasture River Pres. Ass'n*, 911 F.3d at 170-71 (4th Cir. 2018) (holding that Forest Service had obligation to independently review issues and not rely on FERC's environmental review).

reduction achieved between control alternatives"); Response to Comments 32-33

(JA02177-78) (analyzing cost effectiveness of other pollution control

technologies).  The Board adopted DEQ's decision *not* to consider electric motors.

The Court should reject Atlantic's suggestion to the contrary.

## II.    THE STATE AGENCIES VIOLATED VIRGINIA CODE SECTION 10.1-1307(E) BY FAILING TO CONSIDER THE COMPRESSOR STATION'S DISPROPORTIONATE HEALTH IMPACTS ON THE UNION HILL COMMUNITY AND THE SUITABILITY OF THE SITE.

### A.    The Court Should Rely on the Board's Written Decision—and the DEQ Documents the Board Incorporated Into That Decision—to Determine Compliance With Section 10.1-1307(E).

Petitioners assert that the Board did not consider the Compressor Station's

adverse health effects on the historic African-American community of Union Hill

as required by Va. Code § 10.1-1307(E).  Pets. Br. 38-40.  Respondents argue that

the Board did.  State Br. 51-55; Atlantic Br. 42-47.  To support their argument,

they point to material in the record, the Board's December comment period, and

the individual comments of some Board members.  State Br. 53; Atlantic Br.

43-47.  But what the Board actually offered in its written decision statement and

supporting documents as the rationale for its actions adopted DEQ's factual

findings and conclusions, including DEQ's finding that demographic and health

conditions for Union Hill are *not* relevant under Section 10.1-1307(E).  *See* Pets.

Br. 41-42; Decision Statement ¶ 2 (JA02999).  By failing to address these

important factors, the Board's approval of the Compressor Station permit was arbitrary and capricious.

Under well-established rules of administrative law, the Board's articulation of the reasons for its action—including the documents it incorporated by specific reference in that decision—are the proper focus of the Court's review.  In reviewing a challenged agency action, a court must focus on "the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50.  For its part, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)).  The reviewing court does not correct "deficiencies" in the agency's analysis and "supply a reasoned basis for the agency's action that the agency itself has not given.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Here, the Board's decision statement and its supporting documents neither offer any consideration of demographic or health conditions in Union Hill nor present a rational connection between these factors and the final decision. Respondents agree with Petitioners that these are important, central factors under Section 10.1-1307(E).  *See* State Br. 52-53; Atlantic Br. 41.  While the record contains numerous relevant comments (JA01396-539), the Board's final written

19

decision incorporated DEQ documents that are silent about these factors. Response to Comments 31-32 (JA02176-77); Final Permit Analysis 13 (JA02993). As a result, the Board's decision is not consistent with the record and must be vacated. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (agency action is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency.").

The Board's rationale for its final decision is found in four DEQ documents incorporated at paragraph two of the decision statement. Decision Statement ¶ 2 (JA02999). Only two of those documents, DEQ's response to comments and its final permit analysis, mention the Section 10.1-1307(E) factors. Response to Comments 31-32 (JA02176-77); Final Permit Analysis 13 (JA02993).

The first document was prepared in October 2018—prior to the Board's request for additional information about Union Hill—and DEQ took the position that environmental justice was not part of site suitability. Response to Comments 31-32 (JA02176-77). The second document states that three issues—the special use permit issued by Buckingham County, DEQ's October 2017 site evaluation, and projected compliance with EPA's National Ambient Air Quality Standards ("NAAQS")—are the only issues relevant to site suitability. Final Permit Analysis 13 (JA02993). In other words, the State Agencies' claim that the "Board specifically *rejected* DEQ's initial site suitability analysis," State Br. 55, is wrong.

The decision statement reveals that the Board specifically *adopted* DEQ's factual findings about site suitability, which excluded demographic and health conditions in Union Hill. *See* Va. Code § 10.1-1322.01(P) (requiring explanation when Board's decision varies from DEQ's recommendation).

The State Agencies' attempt to use the individual statements of members to explain the Board's decision is unavailing. *See id.* at 53. The public musings of Board members prior to the final vote are not the Board's findings, do not represent the collective judgment of the Board, and should not form the basis for the Court's review of the Board's final decision. *See, e.g.*, *Carroll v. Town of Rockport*, 837 A.2d 148, 157 (Me. 2003) (recognizing that "individual statements did not represent any collective judgment of the fact-finding agency"); *Wright v. Kan. State Bd. of Educ.*, 268 P.3d 1231, 1242 (Kan. Ct. App. 2012) (disregarding state education board members' individual statements in favor of "their reasoning [] contained in the written findings and conclusions of the Board"); *cf. Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1549 (9th Cir. 1993) (noting that "the mental processes of individual agency members" are not proper components of the administrative record).

Respondents also place unfounded importance on the Board's statement that it "d[id] not adopt any *legal views* expressed by [DEQ] regarding the Board's authority under Va. Code Section 10.1-1307(E)." State Br. 55 (emphasis added);

*see also* Atlantic Br. 47.  But the Board here was addressing the *legal view* that

DEQ announced earlier in the permitting process:  namely, that the Board could

not consider issues that are also subject to local zoning control.  Nov. 9, 2018

Hearing Transcript 50:22-56:22 (JA02251-57).  Regardless of the disagreement

about the Board's authority, the decision statement did not disclaim any of DEQ's

*factual findings or conclusions*—including those about site suitability.  *See*

Decision Statement (JA02999).

The entire purpose of the decision statement is to provide the Board's

explanation and rationale for its final decision.  Respondents now seek to seize on

the record of public comments or the remarks of individual Board members and

refashion them into the Board's collective judgment.  To be sure, the Board

received abundant information about the demographic and health conditions of the

Union Hill community.  *See* Pets. Br. 18-19.  But the public is left to guess what

the Board's final conclusions were on those factors, a hallmark of arbitrary and

capricious agency action.

Specifically, the decision statement's supporting documents do not reveal

whether the Board determined if Union Hill was a minority community based on

race.  *See* Response to Comments 31-32 (JA02176-77); Final Permit Analysis 13

(JA02993).  That determination is critically important to understand whether the

emissions from the Compressor Station will pose an adverse health risk to

community residents.  *See* FEIS 4-513 to 4-514 (JA02372-73) (discussing

increased health risks to African Americans from air pollution).  The supporting

documents also do not indicate whether the Board considered the health conditions

of the community or that fine particle pollution ("PM$_{2.5}$") and formaldehyde

emissions from the Compressor Station could exacerbate health conditions *even if*

the facility complies with NAAQS.  Further, they are silent on whether the Board

determined if health impacts on Union Hill residents would be the same as, or

different than, impacts suffered by others (i.e., disproportionate).

The Court should not accept Respondents' invitation to correct

"deficiencies" in the Board's explanation of its final decision or "supply a reasoned

basis for the agency's action that the agency itself has not given."  *Motor Vehicle

Mfrs. Ass'n*, 463 U.S. at 43.  All parties agree that the demographics and health

conditions of Union Hill are central and important issues in this permitting process.

They are the subject of hundreds of public comments, and the Board was required

to address them.

### B. Respondents Ignore the Board's Obligation to Resolve Conflicting Information in the Record.

Respondents fatally ignore the Board's obligation to "grapple with contrary

evidence."  *Sierra Club*, 899 F.3d at 293 (quoting *Fred Meyer Stores, Inc. v.

NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017)).  "[A]n agency cannot ignore evidence

that undercuts its judgment[] and it may not minimize such evidence without

23

adequate explanation." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018). Respondents dispute two claims raised by Petitioners: (1) that the Board failed to make findings about the demographics and health characteristics of Union Hill, Pets. Br. 51-54; and (2) that the Board wrongly relied on compliance with NAAQS to find no disproportionate impact, *id.* at 43-50. But for both categories of information, Respondents fail to recognize that the Board must address and resolve important conflicting evidence in the record in its decision statement and supporting documents. Because the Board failed to do so, its approval of the Compressor Station permit is arbitrary and capricious. *See Sierra Club*, 899 F.3d at 293.

The Board did not grapple with conflicting information about the demographics and health characteristics of the Union Hill community. For example, just four days before the Board's final decision, Atlantic wrote to the Board that "[t]he record, including demographic analysis, [] shows [] no environmental justice community" in Union Hill. Jan. 2019 Atlantic Comments 1 (JA02849). In contrast, Friends of Buckingham's door-to-door household study described an 84% minority community within one-mile of the proposed Compressor Station, a percentage much higher than the surrounding county (34.7%). Jan. 2019 Household Study Summary (JA02733). The study also revealed that the community has deep historic ties to Freedmen and Freedwomen

24

who settled in Union Hill after the Civil War; 42 households in Union Hill are known descendants of formerly enslaved people from area plantations. *Id.*

The State Agencies unconvincingly attempt to rely on the individual statements of Board Members as addressing and resolving this conflicting information. *See* State Br. 53. As an initial matter, the Court should not rely on the statements of individual Board Members as indicative of the Board's findings and collective decision. Regardless, a review of the statements themselves reveals that these members did not address and resolve the information. For example, Richard Langford and Ignacia Moreno stated that they assumed Union Hill was an "environmental justice" community but did not explain whether they assumed a minority population, a low-income population, or both. Jan. 8, 2019 Hearing Transcript 35:5-6, 59:5-8 (JA02923, JA02947). And neither addressed FERC's finding that African-American communities are especially sensitive to air pollution. *See* FEIS 4-513 to 4-514 (JA02372-73).

Likewise, the Board did not address and resolve conflicting information in the record about whether the Union Hill community will experience disproportionate adverse health effects even if the facility complies with NAAQS. *See* Pets. Br. 46-50. In its January 4, 2019 letter, Atlantic argued that the station will meet "all applicable national ambient air quality standards," and therefore that "there are no adverse health impacts implicating environmental justice

25

considerations" caused by the Compressor Station.  Jan. 2019 Atlantic Comments
1-2 (JA02849-50).  DEQ reached the same conclusion in its presentation to the
Board on January 8, 2019, just before the Board's deliberations and final vote.
Jan. 8, 2019 Hearing Transcript 17:16-18:22, 23:12-25:18 (JA02905-06, JA02911-
13).

But the record also reveals that the Compressor Station will increase the
concentration of air pollutants in Union Hill, including a 69% daily increase in
$PM_{2.5}$. *See* Pets. Br. 50.  A detailed analysis by Dr. George Thurston demonstrated
that the residents of Union Hill will experience disproportionate and adverse
impacts from $PM_{2.5}$ emissions, even at levels below NAAQS.  Thurston Report
(JA01449-88); Thurston Testimony (JA02709-13); Jan. 2019 Chesapeake Bay
Foundation Comments 6 (JA02719).  Dr. Thurston reported that short-term
exposures to $PM_{2.5}$ are causally connected to heart trouble and increased mortality
and identified multiple other detrimental health effects related to this pollutant.
Thurston Report 4-12 (JA01454-62).  Further, the health effects of both long-term
and short-term exposure to $PM_{2.5}$ will rise significantly within a two-mile radius of
the Station.  Pets. Br. 49.  Finally, as EPA has observed, there is no safe level of
exposure to $PM_{2.5}$, which has adverse health effects below the current NAAQS.
EPA, National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg.
3086, 3098 (Jan. 15, 2013).  Again, the decision statement and supporting

documents are silent about how the Board addressed and resolved this conflicting information.

Out of deep concern for their neighbors and friends, members of the Union Hill community and the public assembled a robust record concerning the proposed Compressor Station. This record contained a detailed door-to-door study of Union Hill residents and expert analysis of the likely adverse effects on the community from $PM_{2.5}$ and other pollutants. This information should have been at the heart of any site-suitability review under Section 10.1-1307(E). Yet Respondents now ask the Court to cherry-pick from the record, ignore the contrary evidence, and uphold the Board's decision. Administrative law requires more. *Genuine Parts Co.*, 890 F.3d at 312. Because the Board failed to address and resolve critical evidence related to its Section 10.1-1307(E) review, its approval of the Compressor Station permit was arbitrary and capricious.

### C. Respondents Fail to Address the State Agencies' Undue Reliance on an Improper County Zoning Decision.

The State Agencies neglected even to respond to Petitioners' argument, Pets. Br. 56-59, that they gave undue weight to a special use permit improperly granted by the Buckingham County Board of Supervisors, impermissibly "passing the entire issue off onto a different agency" applying different criteria to make a different type of decision. *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015). By failing to address this issue, the State Agencies

27

concede it.  *See* Fed. R. App. P. 28(b), (a)(8)(A); *Cardsoft, LLC v. Verifone, Inc.*, 807 F.3d 1346, 1353 (Fed. Cir. 2015) (holding that appellee effectively concedes issue by failing to respond to argument in briefing).

Atlantic's response, Atlantic Br. 55-56, misses the point:  the State Agencies' error was not basing their site-suitability determination *solely* on the County's decision or giving that decision *any* weight.  The error was arbitrarily giving *undue* weight to the County's decision to permit a gas transmission facility in an agricultural district, contrary to the County's own zoning ordinance.  *See* Pets. Br. 56-58.  Atlantic offers no defense of this error.

## III. THERE IS NO DISPUTE ABOUT THE BOARD'S ROLE AS DECISION-MAKER FOR THIS PERMIT.

The Court need not dwell on Atlantic's lead argument.  *See* Atlantic Br. 30-31. Petitioners agree that it is the Board's decision that is under review and have demonstrated that the Board erred by adopting DEQ's conclusions on redefining the source and the Section 10.1-1307(E) factors.[3]  *See, e.g.*, Pets. Br. 41 (focusing on the "factors incorporated into the Board's final decision" relating to

---

[3] Petitioners had good reason to refer to the Board and DEQ collectively, as the Board and DEQ are jointly Respondents in this case.  Virginia regulations themselves recognize the intertwined roles of DEQ and the Board.  *See* 9 Va. Admin. Code §§ 5-80-5(C) (defining "Board" as DEQ, except when the Board grants direct consideration of permits or requests for public hearings to contest permit actions), 5-10-20.

the statutory site-suitability and health factors by DEQ). As set forth in Section II, *supra*, Respondents make the more consequential error of conflating the statements of individual Board members with the official decision of the Board. *See* Atlantic Br. 46; State Br. 53-54.

So that there is no confusion, Petitioners reiterate that their claims are based on the Board's decision statement and the DEQ materials specifically incorporated into the Board's decision. *See* Decision Statement ¶ 2 (JA02999).

## CONCLUSION

For the reasons set forth herein and in Petitioners' opening brief, the petition for review should be granted, and the permit should be vacated and remanded to the Board. Petitioners also submit that oral argument should be heard in light of the complex technical issues and questions of federal and state law raised by the parties' briefs.


Respectfully submitted,


s/ David L. Neal
David L. Neal
SOUTHERN ENVIRONMENTAL LAW CENTER
601 West Rosemary St., Suite 220
Chapel Hill, NC 27516
(919) 967-1450
dneal@selcnc.org

Gregory Buppert
SOUTHERN ENVIRONMENTAL LAW CENTER
201 West Main St., Suite 14
Charlottesville, VA 22902
(434) 977-4090

*Counsel for Friends of Buckingham*

s/ Jon A. Mueller
Jon A. Mueller
Margaret L. Sanner
CHESAPEAKE BAY FOUNDATION, INC.
6 Herndon Avenue
Annapolis, MD 21403
(443) 482-2162
jmueller@cbf.org

*Counsel for Chesapeake Bay Foundation, Inc.*

Dated:  August 16, 2019

# Addendum

# TABLE OF CONTENTS

**Statutes**

    Va. Code § 2.2-4027 ................................................................ ADD 1

    Va. Code § 10.1-1322.01 ........................................................ ADD 3

**Regulations**

    9 Va. Admin. Code § 5-10-20 ................................................ ADD 7

    9 Va. Admin. Code § 5-80-5 ................................................ ADD 22

    9 Va. Admin. Code § 5-80-1110 ........................................ ADD 27

ii

West's Annotated Code of Virginia
Title 2.2. Administration of Government (Refs & Annos)
Subtitle II. Administration of State Government
Part B. Transaction of Public Business
Chapter 40. Administrative Process Act (Refs & Annos)
Article 5. Court Review (Refs & Annos)

VA Code Ann. § 2.2-4027

§ 2.2-4027. Issues on review

Effective: July 1, 2013
Currentness

The burden shall be upon the party complaining of agency action to designate and demonstrate an error of law subject to review by the court. Such issues of law include: (i) accordance with constitutional right, power, privilege, or immunity, (ii) compliance with statutory authority, jurisdiction limitations, or right as provided in the basic laws as to subject matter, the stated objectives for which regulations may be made, and the factual showing respecting violations or entitlement in connection with case decisions, (iii) observance of required procedure where any failure therein is not mere harmless error, and (iv) the substantiality of the evidentiary support for findings of fact. The determination of such fact issue shall be made upon the whole evidentiary record provided by the agency if its proceeding was required to be conducted as provided in § 2.2-4009 or 2.2-4020 or, as to subjects exempted from those sections, pursuant to constitutional requirement or statutory provisions for opportunity for an agency record of and decision upon the evidence therein.

In addition to any other judicial review provided by law, a small business, as defined in subsection A of § 2.2-4007.1, that is adversely affected or aggrieved by final agency action shall be entitled to judicial review of compliance with the requirements of subdivision A 2 of § 2.2-4007.04 and § 2.2-4007.1 within one year following the date of final agency action.

When the decision on review is to be made on the agency record, the duty of the court with respect to issues of fact shall be to determine whether there was substantial evidence in the agency record to support the agency decision. The duty of the court with respect to the issues of law shall be to review the agency decision de novo. The court shall enter judgment in accordance with § 2.2-4029.

Where there is no agency record so required and made, any necessary facts in controversy shall be determined by the court upon the basis of the agency file, minutes, and records of its proceedings under § 2.2-4007.01 or 2.2-4019 as augmented, if need be, by the agency pursuant to order of the court or supplemented by any allowable and necessary proofs adduced in court except that the function of the court shall be to determine only whether the result reached by the agency could reasonably be said, on all such proofs, to be within the scope of the legal authority of the agency.

Whether the fact issues are reviewed on the agency record or one made in the review action, the court shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted.

**Credits**
Acts 2001, c. 844, eff. Oct. 1, 2001; Acts 2005, c. 619; Acts 2005, c. 682; Acts 2007, c. 873; Acts 2007, c. 916; Acts 2013, c. 619.

ADD 1

Notes of Decisions (399)

VA Code Ann. § 2.2-4027, VA ST § 2.2-4027
The statutes and Constitution are current through End of the 2019 Reg. Sess.

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

ADD 2

West's Annotated Code of Virginia
  Title 10.1. Conservation (Refs & Annos)
    Subtitle II. Activities Administered by Other Entities
      Chapter 13. Air Pollution Control Board (Refs & Annos)
        Article 1. General Provisions (Refs & Annos)

VA Code Ann. § 10.1-1322.01

§ 10.1-1322.01. Permits; procedures for public hearings and permits before the Board

Effective: July 1, 2018
Currentness

A. During the public comment period on a permit action, interested persons may request a public hearing to contest such action or the terms and conditions thereof. Where public hearings are mandatory under state or federal law or regulation, interested persons may request, during the public comment period on the permit action, that the Board consider the permit action pursuant to the requirements of this section.

B. Requests for a public hearing or Board consideration shall contain the following information:

1. The name, mailing address, and telephone number of the requester;

2. The names and addresses of all persons for whom the requester is acting as a representative (for the purposes of this requirement, an unincorporated association is a person);

3. The reason why a public hearing or Board consideration is requested;

4. A brief, informal statement setting forth the factual nature and the extent of the interest of the requester or of the persons for whom the requester is acting as representative in the application or tentative determination, including an explanation of how and to what extent such interest would be directly and adversely affected by the issuance, denial, modification, or revocation of the permit in question; and

5. Where possible, specific references to the terms and conditions of the permit in question, together with suggested revisions and alterations of those terms and conditions that the requester considers are needed to conform the permit to the intent and provisions of the State Air Pollution Control Law (§ 10.1-1300 et seq.).

C. Upon completion of the public comment period on a permit action, the Director shall review all timely requests for public hearing or Board consideration filed during the public comment period on the permit action and within 30 calendar days following the expiration of the time period for the submission of requests shall grant a public hearing or Board consideration after the public hearing required by state or federal law or regulation, unless the permittee or applicant agrees to a later date, if the Director finds the following:

ADD.3

1. That there is a significant public interest in the issuance, denial, modification, or revocation of the permit in question as evidenced by receipt of a minimum of 25 individual requests for a public hearing or Board consideration;

2. That the requesters raise substantial, disputed issues relevant to the issuance, denial, modification, or revocation of the permit in question; and

3. That the action requested by the interested party is not on its face inconsistent with, or in violation of, the State Air Pollution Control Law (§ 10.1-1300 et seq.), federal law or any regulation promulgated thereunder.

D. Either the Director or a majority of the Board members, acting independently, may request a meeting of the Board to be convened within 20 days of the Director's decision pursuant to subsection C in order to review such decision and determine by a majority vote of the Board whether or not to grant a public hearing or Board consideration, or to delegate the permit to the Director for his decision.

For purposes of this subsection, if a Board meeting is held via electronic communication means, the meeting shall be held in compliance with the provisions of § 2.2-3708.2, except that a quorum of the Board is not required to be physically assembled at one primary or central meeting location. Discussions of the Board held via such electronic communication means shall be specifically limited to a (i) review of the Director's decision pursuant to subsection C, (ii) determination of the Board whether or not to grant a public hearing or Board consideration, or (iii) delegation of the permit to the Director for his decision. No other matter of public business shall be discussed or transacted by the Board during any such meeting held via electronic communication means.

E. The Director shall, forthwith, notify by mail at his last known address (i) each requester and (ii) the applicant or permittee of the decision to grant or deny a public hearing or Board consideration.

F. In addition to subsections C, D, and E, the Director may, in his discretion, convene a public hearing on a permit action or submit a permit action to the Board for its consideration.

G. If a determination is made to hold a public hearing, the Director shall schedule the hearing at a time between 45 and 75 days after mailing of the notice required by subsection E.

H. The Director shall cause, or require the applicant to publish, notice of a public hearing to be published once, in a newspaper of general circulation in the city or county where the facility or operation that is the subject of the permit or permit application is located, at least 30 days before the hearing date.

I. The Director may, on his own motion or at the request of the applicant or permittee, for good cause shown, reschedule the date of the public hearing. In the event the Director reschedules the date for the public hearing after notice has been published, he shall, or require the applicant to, provide reasonable notice of the new date of the public hearing. Such notice shall be published once in the same newspaper where the original notice was published.

J. Public hearings held pursuant to these procedures may be conducted by (i) the Board at a regular or special meeting of the Board or (ii) one or more members of the Board. A member of the Board shall preside over the public hearing.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

ADD-4

K. The presiding Board member shall have the authority to maintain order, preserve the impartiality of the decision process, and conclude the hearing process expeditiously. The presiding Board member, in order to carry out his responsibilities under this subsection, is authorized to exercise the following powers, including but not limited to:

1. Prescribing the methods and procedures to be used in the presentation of factual data, arguments, and proof orally and in writing including the imposition of reasonable limitations on the time permitted for oral testimony;

2. Consolidating the presentation of factual data, arguments, and proof to avoid repetitive presentation of them;

3. Ruling on procedural matters; and

4. Acting as custodian of the record of the public hearing causing all notices and written submittals to be entered in it.

L. The public comment period will remain open for 15 days after the close of the public hearing if required by § 10.1-1307.01.

M. When the public hearing is conducted by less than a quorum of the Board, the Department shall, promptly after the close of the public hearing comment period, make a report to the Board.

N. After the close of the public hearing comment period, the Board shall, at a regular or special meeting, take final action on the permit. Such decision shall be issued within 90 days of the close of the public comment period or from a later date, as agreed to by the permittee or applicant and the Board or the Director. The Board shall not take any action on a permit where a public hearing was convened solely to satisfy the requirements of state or federal law or regulation unless the permit was provided to the Board for its consideration pursuant to the provisions of this section.

O. When the public hearing was conducted by less than a quorum of the Board, persons who commented during the public comment period shall be afforded an opportunity at the Board meeting when final action is scheduled to respond to any summaries of the public comments prepared by the Department for the Board's consideration subject to such reasonable limitations on the time permitted for oral testimony or presentation of repetitive material as are determined by the Board.

P. In making its decision, the Board shall consider (i) the verbal and written comments received during the public comment period made part of the record, (ii) any explanation of comments previously received during the public comment period made at the Board meeting, (iii) the comments and recommendation of the Department, and (iv) the agency files. When the decision of the Board is to adopt the recommendation of the Department, the Board shall provide in writing a clear and concise statement of the legal basis and justification for the decision reached. When the decision of the Board varies from the recommendation of the Department, the Board shall, in consultation with legal counsel, provide a clear and concise statement explaining the reason for the variation and how the Board's decision is in compliance with applicable laws and regulations. The written statement shall be provided contemporaneously with the decision of the Board. Copies of the decision, certified by the Director, shall be mailed by certified mail to the permittee or applicant.

ADD 5

**Credits**

Acts 2008, c. 276; Acts 2008, c. 557; Acts 2009, c. 627. Amended by Acts 2018, c. 55.

VA Code Ann. § 10.1-1322.01, VA ST § 10.1-1322.01

The statutes and Constitution are current through End of the 2019 Reg. Sess.

---

**End of Document**                                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Virginia Administrative Code
    Title 9. Environment (Refs & Annos)
        Vac Agency NO. 5. State Air Pollution Control Board (Refs & Annos)
            Chapter 10. General Definitions (Refs & Annos)

9 VAC 5-10-20

9 VAC 5-10-20. Terms defined.

Currentness

*"Actual emissions rate"* means the actual rate of emissions of a pollutant from an emissions unit. In general actual emissions shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during the most recent two-year period or some other two-year period which is representative of normal source operation. If the board determines that no two-year period is representative of normal source operation, the board shall allow the use of an alternative period of time upon a determination by the board that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

*"Administrator"* means the administrator of the U.S. Environmental Protection Agency (EPA) or his authorized representative.

*"Affected facility"* means, with reference to a stationary source, any part, equipment, facility, installation, apparatus, process or operation to which an emission standard is applicable or any other facility so designated. The term "affected facility" includes any affected source as defined in 40 CFR 63.2.

*"Air pollution"* means the presence in the outdoor atmosphere of one or more substances which are or may be harmful or injurious to human health, welfare or safety; to animal or plant life; or to property; or which unreasonably interfere with the enjoyment by the people of life or property.

*"Air quality"* means the specific measurement in the ambient air of a particular air pollutant at any given time.

*"Air quality control region"* means any area designated as such in 9 VAC 5-20-200.

*"Alternative method"* means any method of sampling and analyzing for an air pollutant which is not a reference or equivalent method, but which has been demonstrated to the satisfaction of the board, in specific cases, to produce results adequate for its determination of compliance.

*"Ambient air"* means that portion of the atmosphere, external to buildings, to which the general public has access.

*"Ambient air quality standard"* means any primary or secondary standard designated as such in 9 VAC 5-30 (Ambient Air Quality Standards).

*"Board"* means the State Air Pollution Control Board or its designated representative.

*"Certified mail"* means electronically certified or postal certified mail, except that this definition shall only apply to the mailing of plan approvals, permits, or certificates issued under the provisions of these regulations and only where the recipient has notified the department of the recipient's consent to receive plan approvals, permits, or certificates by electronic mail. Any provision of these regulations requiring the use of certified mail to transmit special orders or administrative orders pursuant to enforcement proceedings shall mean postal certified mail.

*"Class I area"* means any prevention of significant deterioration area (i) in which virtually any deterioration of existing air quality is considered significant and (ii) designated as such in 9 VAC 5-20-205.

*"Class II area"* means any prevention of significant deterioration area (i) in which any deterioration of existing air quality beyond that normally accompanying well-controlled growth is considered significant and (ii) designated as such in 9 VAC 5-20-205.

*"Class III area"* means any prevention of significant deterioration area (i) in which deterioration of existing air quality to the levels of the ambient air quality standards is permitted and (ii) designated as such in 9 VAC 5-20-205.

*"Continuous monitoring system"* means the total equipment used to sample and condition (if applicable), to analyze, and to provide a permanent continuous record of emissions or process parameters.

*"Control program"* means a plan formulated by the owner of a stationary source to establish pollution abatement goals, including a compliance schedule to achieve such goals. The plan may be submitted voluntarily, or upon request or by order of the board, to ensure compliance by the owner with standards, policies and regulations adopted by the board. The plan shall include system and equipment information and operating performance projections as required by the board for evaluating the probability of achievement. A control program shall contain the following increments of progress:

1. The date by which contracts for emission control system or process modifications are to be awarded, or the date by which orders are to be issued for the purchase of component parts to accomplish emission control or process modification.

2. The date by which the on-site construction or installation of emission control equipment or process change is to be initiated.

3. The date by which the on-site construction or installation of emission control equipment or process modification is to be completed.

4. The date by which final compliance is to be achieved.

*"Criteria pollutant"* means any pollutant for which an ambient air quality standard is established under 9 VAC 5-30 (Ambient Air Quality Standards).

*"Day"* means a 24-hour period beginning at midnight.

*"Delayed compliance order"* means any order of the board issued after an appropriate hearing to an owner which postpones the date by which a stationary source is required to comply with any requirement contained in the applicable implementation plan.

*"Department"* means any employee or other representative of the Virginia Department of Environmental Quality, as designated by the director.

*"Director"* or *"executive director"* means the director of the Virginia Department of Environmental Quality or a designated representative.

*"Dispersion technique"*

1. Means any technique which attempts to affect the concentration of a pollutant in the ambient air by:

   a. Using that portion of a stack which exceeds good engineering practice stack height;

   b. Varying the rate of emission of a pollutant according to atmospheric conditions or ambient concentrations of that pollutant; or

   c. Increasing final exhaust gas plume rise by manipulating source process parameters, exhaust gas parameters, stack parameters, or combining exhaust gases from several existing stacks into one stack; or other selective handling of exhaust gas streams so as to increase the exhaust gas plume rise.

2. Subdivision 1 of this definition does not include:

   a. The reheating of a gas stream, following use of a pollution control system, for the purpose of returning the gas to the temperature at which it was originally discharged from the facility generating the gas stream;

   b. The merging of exhaust gas streams where:

   (1) The owner demonstrates that the facility was originally designed and constructed with such merged gas streams;

   (2) After July 8, 1985, such merging is part of a change in operation at the facility that includes the installation of pollution controls and is accompanied by a net reduction in the allowable emissions of a pollutant. This exclusion from the definition of "dispersion techniques" shall apply only to the emissions limitation for the pollutant affected by such change in operation; or

   (3) Before July 8, 1985, such merging was part of a change in operation at the facility that included the installation of emissions control equipment or was carried out for sound economic or engineering reasons. Where there was an increase in the emissions limitation or, in the event that no emissions limitation was in existence prior to the merging, an increase in the quantity of pollutants actually emitted prior to the merging, the board shall presume that merging was significantly motivated by an intent to gain emissions credit for greater dispersion. Absent a demonstration by the owner that merging was not significantly motivated by such intent, the board shall deny credit for the effects of such merging in calculating the allowable emissions for the source;

   c. Smoke management in agricultural or silvicultural prescribed burning programs;

d. Episodic restrictions on residential woodburning and open burning; or

e. Techniques under subdivision 1 c of this definition which increase final exhaust gas plume rise where the resulting allowable emissions of sulfur dioxide from the facility do not exceed 5,000 tons per year.

*"Emergency"* means a situation that immediately and unreasonably affects, or has the potential to immediately and unreasonably affect, public health, safety or welfare; the health of animal or plant life; or property, whether used for recreational, commercial, industrial, agricultural or other reasonable use.

*"Emissions limitation"* means any requirement established by the board which limits the quantity, rate, or concentration of continuous emissions of air pollutants, including any requirements which limit the level of opacity, prescribe equipment, set fuel specifications, or prescribe operation or maintenance procedures to assure continuous emission reduction.

*"Emission standard"* means any provision of 9 VAC 5-40 (Existing Stationary Sources), 9 VAC 5-50 (New and Modified Stationary Sources), or 9 VAC 5-60 (Hazardous Air Pollutant Sources) that prescribes an emissions limitation, or other requirements that control air pollution emissions.

*"Emissions unit"* means any part of a stationary source which emits or would have the potential to emit any air pollutant.

*"Equivalent method"* means any method of sampling and analyzing for an air pollutant which has been demonstrated to the satisfaction of the board to have a consistent and quantitative relationship to the reference method under specified conditions.

*"EPA"* means the U.S. Environmental Protection Agency or an authorized representative.

*"Excess emissions"* means emissions of air pollutant in excess of an emission standard.

*"Excessive concentration"* is defined for the purpose of determining good engineering practice (GEP) stack height under subdivision 3 of the GEP definition and means:

1. For sources seeking credit for stack height exceeding that established under subdivision 2 of the GEP definition, a maximum ground-level concentration due to emissions from a stack due in whole or part to downwash, wakes, and eddy effects produced by nearby structures or nearby terrain features which individually is at least 40% in excess of the maximum concentration experienced in the absence of such downwash, wakes, or eddy effects and which contributes to a total concentration due to emissions from all sources that is greater than an ambient air quality standard. For sources subject to the provisions of Article 8 (9 VAC 5-80-1605 et seq.) of Part II of 9 VAC 5-80 (Permits for Stationary Sources), an excessive concentration alternatively means a maximum ground-level concentration due to emissions from a stack due in whole or part to downwash, wakes, or eddy effects produced by nearby structures or nearby terrain features which individually is at least 40% in excess of the maximum concentration experienced in the absence of the maximum concentration experienced in the absence of such downwash, wakes, or eddy effects and greater than a prevention of significant deterioration increment. The allowable emission rate to be used in making demonstrations under this provision shall be prescribed by the new source performance standard that is applicable to the source category unless the owner demonstrates that this emission rate is infeasible. Where such demonstrations are approved by the board, an alternative emission rate shall be established in consultation with the owner;

ADD10

2. For sources seeking credit after October 11, 1983, for increases in existing stack heights up to the heights established under subdivision 2 of the GEP definition, either (i) a maximum ground-level concentration due in whole or part to downwash, wakes or eddy effects as provided in subdivision 1 of this definition, except that the emission rate specified by any applicable implementation plan (or, in the absence of such a limit, the actual emission rate) shall be used, or (ii) the actual presence of a local nuisance caused by the existing stack, as determined by the board; and

3. For sources seeking credit after January 12, 1979, for a stack height determined under subdivision 2 of the GEP definition where the board requires the use of a field study or fluid model to verify GEP stack height, for sources seeking stack height credit after November 9, 1984, based on the aerodynamic influence of cooling towers, and for sources seeking stack height credit after December 31, 1970, based on the aerodynamic influence of structures not adequately represented by the equations in subdivision 2 of the GEP definition, a maximum ground-level concentration due in whole or part to downwash, wakes or eddy effects that is at least 40% in excess of the maximum concentration experienced in the absence of such downwash, wakes, or eddy effects.

*"Existing source"* means any stationary source other than a new source or modified source.

*"Facility"* means something that is built, installed or established to serve a particular purpose and includes, but is not limited to, buildings, installations, public works, businesses, commercial and industrial plants, shops and stores, heating and power plants, apparatus, processes, operations, structures, and equipment of all types.

*"Federal Clean Air Act"* means Chapter 85 (§ 7401 et seq.) of Title 42 of the United States Code.

*"Federally enforceable"* means all limitations and conditions which are enforceable by the administrator and citizens under the federal Clean Air Act or that are enforceable under other statutes administered by the administrator. Federally enforceable limitations and conditions include, but are not limited to, the following:

1. Emission standards, alternative emission standards, alternative emissions limitations, and equivalent emissions limitations established pursuant to § 112 of the federal Clean Air Act as amended in 1990.

2. New source performance standards established pursuant to § 111 of the federal Clean Air Act, and emission standards established pursuant to § 112 of the federal Clean Air Act before it was amended in 1990.

3. All terms and conditions in a federal operating permit, including any provisions that limit a source's potential to emit, unless expressly designated as not federally enforceable.

4. Limitations and conditions that are part of an implementation plan.

5. Limitations and conditions that are part of a § 111(d) or 111(d)/129 plan.

6. Limitations and conditions that are part of a federal construction permit issued under 40 CFR 52.21 or any construction permit issued under regulations approved by EPA in accordance with 40 CFR Part 51.

7. Limitations and conditions that are part of an operating permit issued pursuant to a program approved by EPA into an implementation plan as meeting EPA's minimum criteria for federal enforceability, including adequate notice and opportunity for EPA and public comment prior to issuance of the final permit and practicable enforceability.

8. Limitations and conditions in a Virginia regulation or program that has been approved by EPA under subpart E of 40 CFR Part 63 for the purposes of implementing and enforcing § 112 of the federal Clean Air Act.

9. Individual consent agreements issued pursuant to the legal authority of EPA.

*"Good engineering practice"* or *"GEP,"* with reference to the height of the stack, means the greater of:

1. 65 meters, measured from the ground-level elevation at the base of the stack;

2. a. For stacks in existence on January 12, 1979, and for which the owner had obtained all applicable permits or approvals required under 9 VAC 5-80 (Permits for Stationary Sources),

$Hg = 2.5H$,

provided the owner produces evidence that this equation was actually relied on in establishing an emissions limitation;

b. For all other stacks,

$Hg = H + 1.5L$,

where:

$Hg$ = good engineering practice stack height, measured from the ground-level elevation at the base of the stack,

$H$ = height of nearby structure(s) measured from the ground-level elevation at the base of the stack,

$L$ = lesser dimension, height or projected width, of nearby structure(s) provided that the board may require the use of a field study or fluid model to verify GEP stack height for the source; or

3. The height demonstrated by a fluid model or a field study approved by the board, which ensures that the emissions from a stack do not result in excessive concentrations of any air pollutant as a result of atmospheric downwash, wakes, or eddy effects created by the source itself, nearby structures or nearby terrain features.

*"Hazardous air pollutant"* means an air pollutant to which no ambient air quality standard is applicable and which in the judgment of the administrator causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness.

*"Implementation plan"* means the portion or portions of the state implementation plan, or the most recent revision thereof, which has been approved under § 110 of the federal Clean Air Act, or promulgated under § 110(c) of the federal Clean Air Act, or promulgated or approved pursuant to regulations promulgated under § 301(d) of the federal Clean Air Act and which implements the relevant requirements of the federal Clean Air Act.

*"Initial emission test"* means the test required by any regulation, permit issued pursuant to 9 VAC 5-80 (Permits for Stationary Sources), control program, compliance schedule or other enforceable mechanism for determining compliance with new or more stringent emission standards or permit limitations or other emissions limitations requiring the installation or modification of air pollution control equipment or implementation of a control method. Initial emission tests shall be conducted in accordance with 9 VAC 5-40-30.

*"Initial performance test"* means the test required by (i) 40 CFR Part 60 for determining compliance with standards of performance, or (ii) a permit issued pursuant to 9 VAC 5-80 (Permits for Stationary Sources) for determining initial compliance with permit limitations. Initial performance tests shall be conducted in accordance with 9 VAC 5-50-30 and 9 VAC 5-60-30.

*"Isokinetic sampling"* means sampling in which the linear velocity of the gas entering the sampling nozzle is equal to that of the undisturbed gas stream at the sample point.

*"Locality"* means a city, town, county or other public body created by or pursuant to state law.

*"Mail"* means electronic or postal delivery.

*"Maintenance area"* means any geographic region of the United States previously designated as a nonattainment area and subsequently redesignated to attainment subject to the requirement to develop a maintenance plan and designated as such in 9 VAC 5-20-203.

*"Malfunction"* means any sudden failure of air pollution control equipment, of process equipment, or of a process to operate in a normal or usual manner, which failure is not due to intentional misconduct or negligent conduct on the part of the owner or other person. Failures that are caused in part by poor maintenance or careless operation are not malfunctions.

*"Monitoring device"* means the total equipment used to measure and record (if applicable) process parameters.

*"Nearby"* as used in the definition of good engineering practice (GEP) is defined for a specific structure or terrain feature and:

1. For purposes of applying the formulae provided in subdivision 2 of the GEP definition means that distance up to five times the lesser of the height or the width dimension of a structure, but not greater than 0.8 km (1/2 mile); and

2. For conducting demonstrations under subdivision 3 of the GEP definition means not greater than 0.8 km (1/2 mile), except that the portion of a terrain feature may be considered to be nearby which falls within a distance of up to 10 times the maximum height (Ht) of the feature, not to exceed two miles if such feature achieves a height (Ht) 0.8 km from the stack that is at least 40% of the GEP stack height determined by the formulae provided in subdivision 2 b of the GEP definition or 26 meters, whichever is greater, as measured from the ground-level elevation at the base of the stack. The height of the structure or terrain feature is measured from the ground-level elevation at the base of the stack.

*"Nitrogen oxides"* means all oxides of nitrogen except nitrous oxide, as measured by test methods set forth in 40 CFR Part 60.

*"Nonattainment area"* means any area which is shown by air quality monitoring data or, where such data are not available, which is calculated by air quality modeling (or other methods determined by the board to be reliable) to exceed the levels allowed by the ambient air quality standard for a given pollutant including, but not limited to, areas designated as such in 9 VAC 5-20-204.

*"One hour"* means any period of 60 consecutive minutes.

*"One-hour period"* means any period of 60 consecutive minutes commencing on the hour.

*"Organic compound"* means any chemical compound of carbon excluding carbon monoxide, carbon dioxide, carbonic disulfide, carbonic acid, metallic carbides, metallic carbonates and ammonium carbonate.

*"Owner"* means any person, including bodies politic and corporate, associations, partnerships, personal representatives, trustees and committees, as well as individuals, who owns, leases, operates, controls or supervises a source.

*"Particulate matter"* means any airborne finely divided solid or liquid material with an aerodynamic diameter smaller than 100 micrometers.

*"Particulate matter emissions"* means all finely divided solid or liquid material, other than uncombined water, emitted to the ambient air as measured by the applicable reference method, or an equivalent or alternative method.

*"$PM_{10}$"* means particulate matter with an aerodynamic diameter less than or equal to a nominal 10 micrometers as measured by the applicable reference method or an equivalent method.

*"$PM_{10}$ emissions"* means finely divided solid or liquid material, with an aerodynamic diameter less than or equal to a nominal 10 micrometers emitted to the ambient air as measured by the applicable reference method, or an equivalent or alternative method.

*"Performance test"* means a test for determining emissions from new or modified sources.

*"Person"* means an individual, corporation, partnership, association, a governmental body, a municipal corporation, or any other legal entity.

*"Pollutant"* means any substance the presence of which in the outdoor atmosphere is or may be harmful or injurious to human health, welfare or safety, to animal or plant life, or to property, or which unreasonably interferes with the enjoyment by the people of life or property.

*"Potential to emit"* means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment, and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design only if the limitation or its effect on emissions is state and federally enforceable.

*"Prevention of significant deterioration area"* means any area not designated as a nonattainment area in 9 VAC 5-20-204 for a particular pollutant and designated as such in 9 VAC 5-20-205.

*"Proportional sampling"* means sampling at a rate that produces a constant ratio of sampling rate to stack gas flow rate.

*"Public hearing"* means, unless indicated otherwise, an informal proceeding, similar to that provided for in § 2.2-4007.02 of the Administrative Process Act, held to afford persons an opportunity to submit views and data relative to a matter on which a decision of the board is pending.

ADD14

*"Reference method"* means any method of sampling and analyzing for an air pollutant as described in the following EPA regulations:

1. For ambient air quality standards in 9 VAC 5-30 (Ambient Air Quality Standards): The applicable appendix of 40 CFR Part 50 or any method that has been designated as a reference method in accordance with 40 CFR Part 53, except that it does not include a method for which a reference designation has been canceled in accordance with 40 CFR 53.11 or 40 CFR 53.16.

2. For emission standards in 9 VAC 5-40 (Existing Stationary Sources) and 9 VAC 5-50 (New and Modified Stationary Sources): Appendix M of 40 CFR Part 51 or Appendix A of 40 CFR Part 60.

3. For emission standards in 9 VAC 5-60 (Hazardous Air Pollutant Sources): Appendix B of 40 CFR Part 61 or Appendix A of 40 CFR Part 63.

*"Regional director"* means the regional director of an administrative region of the Department of Environmental Quality or a designated representative.

*"Regulation of the board"* means any regulation adopted by the State Air Pollution Control Board under any provision of the Code of Virginia.

*"Regulations for the Control and Abatement of Air Pollution"* means 9 VAC 5-10 (General Definitions) through 9 VAC 5-80 (Permits for Stationary Sources).

*"Reid vapor pressure"* means the absolute vapor pressure of volatile crude oil and volatile nonviscous petroleum liquids except liquefied petroleum gases as determined by American Society for Testing and Materials publication, "Standard Test Method for Vapor Pressure of Petroleum Products (Reid Method)" (see 9 VAC 5-20-21).

*"Run"* means the net period of time during which an emission sample is collected. Unless otherwise specified, a run may be either intermittent or continuous within the limits of good engineering practice.

*"Section 111(d) plan"* means the portion or portions of the plan, or the most recent revision thereof, which has been approved under 40 CFR 60.27(b) in accordance with § 111(d)(1) of the federal Clean Air Act, or promulgated under 40 CFR 60.27(d) in accordance with § 111(d)(2) of the federal Clean Air Act, and which implements the relevant requirements of the federal Clean Air Act.

*"Section 111(d)/129 plan"* means the portion or portions of the plan, or the most recent revision thereof, which has been approved under 40 CFR 60.27(b) in accordance with §§ 111(d)(1) and 129(b)(2) of the federal Clean Air Act, or promulgated under 40 CFR 60.27(d) in accordance with §§ 111(d)(2) and 129(b)(3) of the federal Clean Air Act, and which implements the relevant requirements of the federal Clean Air Act.

*"Shutdown"* means the cessation of operation of an affected facility for any purpose.

*"Source"* means any one or combination of the following: buildings, structures, facilities, installations, articles, machines, equipment, landcraft, watercraft, aircraft or other contrivances which contribute, or may contribute, either directly or indirectly to air pollution. Any activity by any person that contributes, or may contribute, either directly or indirectly to air pollution, including, but not limited to, open burning, generation of fugitive dust or emissions, and cleaning with abrasives or chemicals.

ADD15

*"Stack"* means any point in a source designed to emit solids, liquids or gases into the air, including a pipe or duct, but not including flares.

*"Stack in existence"* means that the owner had:

1. Begun, or caused to begin, a continuous program of physical on-site construction of the stack; or

2. Entered into binding agreements or contractual obligations, which could not be canceled or modified without substantial loss to the owner, to undertake a program of construction of the stack to be completed in a reasonable time.

*"Standard conditions"* means a temperature of 20°C (68°F) and a pressure of 760 mm of Hg (29.92 inches of Hg).

*"Standard of performance"* means any provision of 9 VAC 5-50 (New and Modified Stationary Sources) which prescribes an emissions limitation or other requirements that control air pollution emissions.

*"Startup"* means the setting in operation of an affected facility for any purpose.

*"State enforceable"* means all limitations and conditions which are enforceable by the board or department, including, but not limited to, those requirements developed pursuant to 9 VAC 5-170-160; requirements within any applicable regulation, order, consent agreement or variance; and any permit requirements established pursuant to 9 VAC 5-80 (Permits for Stationary Sources).

*"State Implementation Plan"* means the plan, including the most recent revision thereof, which has been approved or promulgated by the administrator, U.S. Environmental Protection Agency, under § 110 of the federal Clean Air Act, and which implements the requirements of § 110.

*"Stationary source"* means any building, structure, facility or installation which emits or may emit any air pollutant. A stationary source shall include all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel. Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same "Major Group" (i.e., which have the same two-digit code) as described in the Standard Industrial Classification Manual (see 9 VAC 5-20-21).

*"These regulations"* means 9 VAC 5-10 (General Definitions) through 9 VAC 5-80 (Permits for Stationary Sources).

*"Total suspended particulate"* or *"TSP"* means particulate matter as measured by the reference method described in Appendix B of 40 CFR Part 50.

*"True vapor pressure"* means the equilibrium partial pressure exerted by a petroleum liquid as determined in accordance with methods described in American Petroleum Institute (API) publication, "Evaporative Loss from Floating-Roof Tanks" (see 9 VAC 5-20-21). The API procedure may not be applicable to some high viscosity or high pour crudes. Available estimates of true vapor pressure may be used in special cases such as these.

*"Urban area"* means any area consisting of a core city with a population of 50,000 or more plus any surrounding localities with a population density of 80 persons per square mile and designated as such in 9 VAC 5-20-201.

ADD16

*"Vapor pressure,"* except where specific test methods are specified, means true vapor pressure, whether measured directly, or determined from Reid vapor pressure by use of the applicable nomograph in American Petroleum Institute publication, "Evaporative Loss from Floating-Roof Tanks" (see 9 VAC 5-20-21).

*"Virginia Air Pollution Control Law"* means Chapter 13 (§ 10.1-1300 et seq.) of Title 10.1 of the Code of Virginia.

*"Volatile organic compound"* means any compound of carbon, excluding carbon monoxide, carbon dioxide, carbonic acid, metallic carbides or carbonates, and ammonium carbonate, which participates in atmospheric photochemical reactions.

1. This includes any such organic compounds which have been determined to have negligible photochemical reactivity other than the following:

a. Methane;

b. Ethane;

c. Methylene chloride (dichloromethane);

d. 1,1,1-trichloroethane (methyl chloroform);

e. 1,1,2-trichloro-1,2,2-trifluoroethane (CFC-113);

f. Trichlorofluoromethane (CFC-11);

g. Dichlorodifluoromethane (CFC-12);

h. Chlorodifluoromethane (H CFC-22);

i. Trifluoromethane (H FC-23);

j. 1,2-dichloro 1,1,2,2,-tetrafluoroethane (CFC-114);

k. Chloropentafluoroethane (CFC-115);

l. 1,1,1-trifluoro 2,2-dichloroethane (HCFC-123);

m. 1,1,1,2-tetrafluoroethane (HFC-134a);

ADD17

n. 1,1-dichloro 1-fluoroethane (HCFC-141b);

o. 1-chloro 1,1-difluoroethane (HCFC-142b);

p. 2-chloro-1,1,1,2-tetrafluoroethane (HCFC-124);

q. Pentafluoroethane (HFC-125);

r. 1,1,2,2-tetrafluoroethane (HFC-134);

s. 1,1,1-trifluoroethane (HFC-143a);

t. 1,1-difluoroethane (HFC-152a);

u. Parachlorobenzotrifluoride (PCBTF);

v. Cyclic, branched, or linear completely methylated siloxanes;

w. Acetone;

x. Perchloroethylene (tetrachloroethylene);

y. 3,3-dichloro-1,1,1,2,2-pentafluoropropane (HCFC-225ca);

z. 1,3-dichloro-1,1,2,2,3-pentafluoropropane (HCFC-225cb);

aa. 1,1,1,2,3,4,4,5,5,5-decafluoropentane (HFC 43-10mee);

bb. Difluoromethane (HFC-32);

cc. Ethylfluoride (HFC-161);

dd. 1,1,1,3,3,3-hexafluoropropane (HFC-236fa);

ee. 1,1,2,2,3-pentafluoropropane (HFC-245ca);

ADD18

ff. 1,1,2,3,3-pentafluoropropane (HFC-245ea);

gg. 1,1,1,2,3-pentafluoropropane (HFC-245eb);

hh. 1,1,1,3,3-pentafluoropropane (HFC-245fa);

ii. 1,1,1,2,3,3-hexafluoropropane (HFC-236ea);

jj. 1,1,1,3,3-pentafluorobutane (HFC-365mfc);

kk. Chlorofluoromethane (HCFC-31);

ll. 1 chloro-1-fluoroethane (HCFC-151a);

mm. 1,2-dichloro-1,1,2-trifluoroethane (HCFC-123a);

nn. 1,1,1,2,2,3,3,4,4-nonafluoro-4-methoxy-butane ($C_4F_9OCH_3$ or HFE-7100);

oo. 2-(difluoromethoxymethyl)-1,1,1,2,3,3,3-hepta-fluoropropane (($CF_3)_2CFCF_2$ $OCH_3$);

pp. 1-ethoxy-1,1,2,2,3,3,4,4,4-nonafluorobutane ($C_4F_9$ $OC_2H_5$ or HFE-7200);

qq. 2-(ethoxydifluoromethyl)-1,1,1,2,3,3,3-hepta-fluoropropane (($CF_3)_2CFCF_2OC_2H_5$);

rr. Methyl acetate;

ss. 1,1,1,2,2,3,3-heptafluoro-3-methoxy-propane (n-$C_3F_7OCH_3$) (HFE-7000);

tt. 3-ethoxy-1,1,1,2,3,4,4,5,5,6,6,6-dodecafluoro-2-(trifluoromethyl) hexane (HFE-7500);

uu. 1,1,1,2,3,3,3-heptafluoropropane (HFC 227ea);

vv. methyl formate ($HCOOCH_3$);

ww. 1,1,1,2,2,3,4,5,5,5-decafluoro-3-methoxy-4-trifluoromethyl-pentane (HFE-7300);

xx. propylene carbonate;

yy. dimethyl carbonate;

zz. trans-1,3,3,3-tetrafluoropropene;

aaa. $HCF_2OCF_2H$ (HFE-134);

bbb. $HCF_2OCF_2OCF_2H$ (HFE-236cal2);

ccc. $HCF_2OCF_2CF_2OCF_2H$ (HFE-338pcc13);

ddd. $HCF_2OCF_2OCF_2CF_2OCF_2H$ (H-Galden 1040x or H-Galden ZT 130 (or 150 or 180));

eee. trans 1-chloro-3,3,3-trifluoroprop-1-ene;

fff. 2,3,3,3-tetrafluoropropene;

ggg. 2-amino-2-methyl-1-propanol;

hhh. t-butyl acetate;

iii. 1,1,2,2-Tetrafluoro-1-(2,2,2-trifluoroethoxy) ethane; and

jjj. Perfluorocarbon compounds that fall into these classes:

(1) Cyclic, branched, or linear, completely fluorinated alkanes;

(2) Cyclic, branched, or linear, completely fluorinated ethers with no unsaturations;

(3) Cyclic, branched, or linear, completely fluorinated tertiary amines with no unsaturations; and

(4) Sulfur containing perfluorocarbons with no unsaturations and with sulfur bonds only to carbon and fluorine.

ADD-20

2. For purposes of determining compliance with emissions standards, volatile organic compounds shall be measured by the appropriate reference method in accordance with the provisions of 9 VAC 5-40-30 or 9 VAC 5-50-30, as applicable. Where such a method also measures compounds with negligible photochemical reactivity, these negligibly reactive compounds may be excluded as a volatile organic compound if the amount of such compounds is accurately quantified, and such exclusion is approved by the board.

3. As a precondition to excluding these compounds as volatile organic compounds or at any time thereafter, the board may require an owner to provide monitoring or testing methods and results demonstrating, to the satisfaction of the board, the amount of negligibly reactive compounds in the emissions of the source.

4. Exclusion of the compounds listed in subdivision 1 of this definition in effect exempts such compounds from the provisions of emission standards for volatile organic compounds. The compounds are exempted on the basis of being so inactive that they will not contribute significantly to the formation of ozone in the troposphere. However, this exemption does not extend to other properties of the exempted compounds which, at some future date, may require regulation and limitation of their use in accordance with requirements of the federal Clean Air Act.

5. Reserved.

*"Welfare"* means that language referring to effects on welfare includes, but is not limited to, effects on soils, water, crops, vegetation, man-made materials, animals, wildlife, weather, visibility and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being.

Notes of Decisions (1)

Official Virginia Administrative Code, current through 35:23 VA.R July 8, 2019, and fast-track regulations current through 35:23 VA.R July 8, 2019.

(c) Thomson Reuters 2019 by the Commonwealth of Virginia

9 VAC 5-10-20, 9 VA ADC 5-10-20

**End of Document**                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

<div style="border:1px solid black; padding:10px;">

Virginia Administrative Code
   Title 9. Environment (Refs & Annos)
      Vac Agency NO. 5. State Air Pollution Control Board (Refs & Annos)
         Chapter 80. Permits for Stationary Sources (Refs & Annos)
            Part I. Permit Actions Before the Board (Refs & Annos)

</div>

9 VAC 5-80-5

9 VAC 5-80-5. Definitions.

Currentness

A. For the purpose of applying this chapter in the context of the Regulations for the Control and Abatement of Air Pollution and related uses, the words or terms shall have the meanings given them in subsection C of this section.

B. Unless otherwise required by context, all terms not defined herein shall have the meaning given them in 9 VAC 5-170 (Regulation for General Administration), 9 VAC 5-10 (General Definitions), or commonly ascribed to them by recognized authorities, in that order of priority.

C. Terms defined.

*"Applicable federal requirement"* means all of, but not limited to, the following as they apply to affected emissions units subject to this chapter (including requirements that have been promulgated or approved by the administrator through rulemaking at the time of permit issuance but have future-effective compliance dates):

    1. Any standard or other requirement provided for in an implementation plan established pursuant to § 110, 111(d) or 129 of the federal Clean Air Act, including any source-specific provisions such as consent agreements or orders.

    2. Any term or condition in any construction permit issued under the new source review program or in any operating permit issued pursuant to the state operating permit program. However, those terms or conditions designated as state-only enforceable shall not be applicable federal requirements.

    3. Any emission standard, alternative emission standard, alternative emissions limitation, equivalent emissions limitation or other requirement established pursuant to § 112 or 129 of the federal Clean Air Act as amended in 1990.

    4. Any new source performance standard or other requirement established pursuant to § 111 of the federal Clean Air Act, and any emission standard or other requirement established pursuant to § 112 of the federal Clean Air Act before it was amended in 1990.

    5. Any limitations and conditions or other requirement in a Virginia regulation or program that has been approved by EPA under Subpart E of 40 CFR Part 63 for the purposes of implementing and enforcing § 112 of the federal Clean Air Act.

6. Any requirement concerning accident prevention under § 112(r)(7) of the federal Clean Air Act.

7. Any compliance monitoring requirements established pursuant to either § 504(b) or § 114(a)(3) of the federal Clean Air Act.

8. Any standard or other requirement for consumer and commercial products under § 183(e) of the federal Clean Air Act.

9. Any standard or other requirement for tank vessels under § 183(f) of the federal Clean Air Act.

10. Any standard or other requirement in 40 CFR Part 55 to control air pollution from outer continental shelf sources.

11. Any standard or other requirement of the regulations promulgated to protect stratospheric ozone under Title VI of the federal Clean Air Act, unless the administrator has determined that such requirements need not be contained in a federal operating permit.

12. With regard to temporary sources subject to 9 VAC 5-80-130, (i) any ambient air quality standard, except applicable state requirements, and (ii) requirements regarding increments or visibility as provided in Article 8 (9 VAC 5-80-1605 et seq.) of Part II of this chapter.

13. Any standard or other requirement under § 126(a)(1) and (c) of the federal Clean Air Act.

*"Board"* means, for the purposes of this chapter, the Department of Environmental Quality. "Board" shall mean the State Air Pollution Control Board only for the purposes of granting direct consideration of permit actions as provided in 9 VAC 5-80-25 and granting requests for public hearings to contest permit actions as provided in 9 VAC 5-80-35.

*"Federally enforceable"* means all limitations and conditions that are enforceable by the administrator and citizens under the federal Clean Air Act or that are enforceable under other statutes administered by the administrator. Federally enforceable limitations and conditions include, but are not limited to the following:

1. Emission standards, alternative emission standards, alternative emissions limitations, and equivalent emissions limitations established pursuant to § 112 of the federal Clean Air Act as amended in 1990.

2. New source performance standards established pursuant to § 111 of the federal Clean Air Act, and emission standards established pursuant to § 112 of the federal Clean Air Act before it was amended in 1990.

3. All terms and conditions (unless expressly designated as state-only enforceable) in a federal operating permit, including any provisions that limit a source's potential to emit.

4. Limitations and conditions that are part of an implementation plan established pursuant to § 110, 111(d) or 129 of the federal Clean Air Act.

ADD-23

5. Limitations and conditions (unless expressly designated as state-only enforceable) that are part of a federal construction permit issued under 40 CFR 52.21 or any construction permit issued under regulations approved by EPA into the implementation plan.

6. Limitations and conditions (unless expressly designated as state-only enforceable) that are part of a state operating permit where the permit and the permit program pursuant to which it was issued meet all of the following criteria:

a. The operating permit program has been approved by the EPA into the implementation plan under § 110 of the federal Clean Air Act.

b. The operating permit program imposes a legal obligation that operating permit holders adhere to the terms and limitations of such permits and provides that permits that do not conform to the operating permit program requirements and the requirements of EPA's underlying regulations may be deemed not "federally enforceable" by EPA.

c. The operating permit program requires that all emissions limitations, controls, and other requirements imposed by such permits will be at least as stringent as any other applicable limitations and requirements contained in the implementation plan or enforceable under the implementation plan, and that the program may not issue permits that waive, or make less stringent, any limitations or requirements contained in or issued pursuant to the implementation plan, or that are otherwise "federally enforceable."

d. The limitations, controls, and requirements in the permit in question are permanent, quantifiable, and otherwise enforceable as a practical matter.

e. The permit in question was issued only after adequate and timely notice and opportunity for comment by EPA and the public.

7. Limitations and conditions in a regulation of the board or program that has been approved by EPA under Subpart E of 40 CFR Part 63 for the purposes of implementing and enforcing § 112 of the federal Clean Air Act.

8. Individual consent agreements that EPA has legal authority to create.

*"Federal hazardous air pollutant new source review (NSR) program"* means a program for the preconstruction review and approval of the construction, reconstruction or modification of any stationary source in accordance with regulations specified in subdivisions 1 through 3 of this definition and promulgated to implement the requirements of § 112 (relating to hazardous air pollutants) of the federal Clean Air Act. Any permit issued under this program is a major NSR permit.

1. The provisions of 40 CFR 61.05, 40 CFR 61.06, 40 CFR 61.07, 40 CFR 61.08 and 40 CFR 61.15 for issuing approvals of the construction of any new source or modification of any existing source subject to the provisions of 40 CFR Part 61.

2. The provisions of 40 CFR 63.5 for issuing approvals to construct a new source or reconstruct a source subject to the provisions of 40 CFR Part 63, except for Subparts B, D and E.

3. The provisions of 40 CFR 63.50 through 40 CFR 63.56 for issuing Notices of MACT Approval prior to the construction of a new emissions unit.

*"Federal hazardous air pollutant new source review (NSR) permit"* means a permit issued under the federal hazardous air pollutant new source review program.

*"Federal operating permit"* means a permit issued under the federal operating permit program.

*"Federal operating permit program"* means an operating permit system (i) for issuing terms and conditions for major stationary sources, (ii) established to implement the requirements of Title V of the federal Clean Air Act and associated regulations, and (iii) codified in Article 1 (9 VAC 5-80-50 et seq.), Article 2 (9 VAC 5-80-310 et seq.), Article 3 (9 VAC 5-80-360 et seq.), and Article 4 (9 VAC 5-80-710 et seq.) of Part II of this chapter.

*"Major new source review (NSR) permit"* means a permit issued under the major new source review program.

*"Major new source review (major NSR) program"* means a preconstruction review and permit program (i) for new major stationary sources or major modifications (physical changes or changes in the method of operation), (ii) established to implement the requirements of §§ 112, 165 and 173 of the federal Clean Air Act and associated regulations, and (iii) codified in Article 7 (9 VAC 5-80-1400 et seq.), Article 8 (9 VAC 5-80-1605 et seq.) and Article 9 (9 VAC 5-80-2000 et seq.) of Part II of this chapter.

*"Minor new source review (NSR) permit"* means a permit issued under the minor new source review program.

*"Minor new source review (minor NSR) program"* means a preconstruction review and permit program (i) for regulated air pollutants from new stationary sources or projects that are not subject to review under the major new source review program, (ii) established to implement the requirements of §§ 110(a)(2)(C) and 112 of the federal Clean Air Act and associated regulations, and (iii) codified in Article 6 (9 VAC 5-80-1100 et seq.) of Part II of this chapter. The minor NSR program may also be used to implement the terms and conditions designated as state-only enforceable; however, those terms and conditions shall not be applicable federal requirements.

*"New source review (NSR) permit"* means a permit issued under the new source review program.

*"New source review (NSR) program"* means a preconstruction review and permit program (i) for regulated air pollutants from new stationary sources or projects (physical changes or changes in the method of operation), (ii) established to implement the requirements of §§ 110(a)(2)(C), 112 (relating to permits for hazardous air pollutants), 165 (relating to permits in prevention of significant deterioration areas), and 173 (relating to permits in nonattainment areas) of the federal Clean Air Act and associated regulations, and (iii) codified in Article 7 (9 VAC 5-80-1400 et seq.), Article 8 (9 VAC 5-80-1605 et seq.) and Article 9 (9 VAC 5-80-2000 et seq.) of Part II of this chapter. The NSR program may also be used to implement the terms and conditions designated as state-only enforceable; however, those terms and conditions shall not be applicable federal requirements.

*"Nonattainment major new source review (NSR) program"* means a preconstruction review and permit program (i) for new major stationary sources or major modifications (physical changes or changes in the method of operation), (ii) established to implement the requirements of § 173 of the federal Clean Air Act and associated

ADD-25

regulations, and (iii) codified in Article 9 (9 VAC 5-80-2000 et seq.) of Part II of this chapter. Any permit issued under this program is a major NSR permit.

*"Nonattainment major new source review (NSR) permit"* means a permit issued under the nonattainment major new source review program.

*"Permit action"* means the activities associated with, and preliminary to, a decision of the board to approve, approve with conditions, or disapprove permit applications; actions to amend or modify permit terms or conditions; actions to renew, reopen, invalidate, suspend, revoke or enforce permit terms or conditions. The term "permit action" does not include actions to combine permit terms and conditions, provided there are no changes to any permit term or condition.

*"Prevention of Significant Deterioration (PSD) program"* means a preconstruction review and permit program (i) for new major stationary sources or major modifications (physical changes or changes in the method of operation), (ii) established to implement the requirements of § 165 of the federal Clean Air Act and associated regulations, and (iii) codified in Article 8 (9 VAC 5-80-1605 et seq.) of Part II of this chapter. Any permit issued under this program is a major NSR permit.

*"Prevention of Significant Deterioration permit"* means a permit issued under the Prevention of Significant Deterioration program.

*"Public comment period"* means a time during which the public shall have the opportunity to comment on the permit application information (exclusive of confidential information) for a new stationary source or project, the preliminary review and analysis of the effect of the source upon the ambient air quality, and the preliminary decision of the board regarding the permit application.

*"Public hearing"* means, unless indicated otherwise, an informal proceeding, similar to that provided for in § 2.2-4007 of the Administrative Process Act, held to afford people an opportunity to submit views and data relative to a matter on which a decision of the board is pending.

*"Public participation process"* means any element of a board or department decision-making process that provides an opportunity to submit views and data relative to a matter on which a decision of the board is pending.

*"State operating permit"* means a permit issued under the state operating permit program.

*"State operating permit program"* means an operating permit program (i) for issuing limitations and conditions for stationary sources, (ii) promulgated to meet the EPA's minimum criteria for federal enforceability, including adequate notice and opportunity for the EPA and public comment prior to issuance of the final permit, and practicable enforceability, and (iii) codified in Article 5 (9 VAC 5-80-800 et seq.) of Part II of this chapter.

Official Virginia Administrative Code, current through 35:23 VA.R July 8, 2019, and fast-track regulations current through 35:23 VA.R July 8, 2019.

(c) Thomson Reuters 2019 by the Commonwealth of Virginia

9 VAC 5-80-5, 9 VA ADC 5-80-5

 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Virginia Administrative Code
   Title 9. Environment (Refs & Annos)
      Vac Agency NO. 5. State Air Pollution Control Board (Refs & Annos)
         Chapter 80. Permits for Stationary Sources (Refs & Annos)
            Part II. Permit Procedures (Refs & Annos)
               Article 6. Permits for New and Modified Stationary Sources (Refs & Annos)

9 VAC 5-80-1110

9 VAC 5-80-1110. Definitions.

Currentness

A. For the purpose of applying this article in the context of the Regulations for the Control and Abatement of Air Pollution and related uses, the words or terms shall have the meanings given them in subsection C of this section.

B. As used in this article, all terms not defined herein shall have the meanings given them in 9 VAC 5-10 (General Definitions), unless otherwise required by context.

C. Terms defined.

*"Addition"* means the construction of a new emissions unit at or the relocation of an existing emissions unit to a stationary source.

*"Affected emissions units"* means the following emissions units, as applicable:

   1. For a new stationary source, all emissions units.

   2. For a project, the added, modified, and replacement emissions units that are part of the project.

   *"Applicable federal requirement"* means all of, but not limited to, the following as they apply to affected emissions units subject to this article (including requirements that have been promulgated or approved by the administrator through rulemaking at the time of permit issuance but have future-effective compliance dates):

      1. Any standard or other requirement provided for in an implementation plan established pursuant to § 110, § 111(d), or § 129 of the federal Clean Air Act, including any source-specific provisions such as consent agreements or orders.

      2. Any term or condition in any construction permit issued under the new source review program or in any operating permit issued pursuant to the state operating permit program. However, those terms or conditions designated as state-only enforceable pursuant to 9 VAC 5-80-1120 F or 9 VAC 5-80-820 G shall not be applicable federal requirements.

3. Any emission standard, alternative emission standard, alternative emissions limitation, equivalent emissions limitation or other requirement established pursuant to § 112 or § 129 of the federal Clean Air Act as amended in 1990.

4. Any new source performance standard or other requirement established pursuant to § 111 of the federal Clean Air Act, and any emission standard or other requirement established pursuant to § 112 of the federal Clean Air Act before it was amended in 1990.

5. Any limitations and conditions or other requirement in a Virginia regulation or program that has been approved by EPA under Subpart E of 40 CFR Part 63 for the purposes of implementing and enforcing § 112 of the federal Clean Air Act.

6. Any requirement concerning accident prevention under § 112(r)(7) of the federal Clean Air Act.

7. Any compliance monitoring requirements established pursuant to either § 504(b) or § 114(a)(3) of the federal Clean Air Act.

8. Any standard or other requirement for consumer and commercial products under § 183(e) of the federal Clean Air Act.

9. Any standard or other requirement for tank vessels under § 183(f) of the federal Clean Air Act.

10. Any standard or other requirement in 40 CFR Part 55 to control air pollution from outer continental shelf sources.

11. Any standard or other requirement of the regulations promulgated to protect stratospheric ozone under Title VI of the federal Clean Air Act, unless the administrator has determined that such requirements need not be contained in a federal operating permit.

12. With regard to temporary sources subject to 9 VAC 5-80-130, (i) any ambient air quality standard, except applicable state requirements, and (ii) requirements regarding increments or visibility as provided in Article 8 (9 VAC 5-80-1605 et seq.) of this part.

13. Any standard or other requirement under § 126 (a)(1) and (c) of the federal Clean Air Act.

*"Begin actual construction"* means initiation of permanent physical on-site construction of an emissions unit. This includes, but is not limited to, installation of building supports and foundations, laying of underground pipework, and construction of permanent storage structures. With respect to a change in method of operation, this term refers to those on-site activities other than preparatory activities which mark the initiation of the change. With respect to the initial location or relocation of a portable emissions unit, this term refers to the delivery of any portion of the portable emissions unit to the site.

*"Clean wood"* means uncontaminated natural or untreated wood. Clean wood includes but is not limited to byproducts of harvesting activities conducted for forest management or commercial logging, or mill residues consisting of bark, chips, edgings, sawdust, shavings, or slabs. It does not include wood that has been treated, adulterated, or chemically changed in some way; treated with glues, binders, or resins; or painted, stained, or coated.

*"Commence,"* as applied to the construction of an emissions unit, means that the owner has all necessary preconstruction approvals or permits and has either:

  1. Begun, or caused to begin, a continuous program of actual on-site construction of the unit, to be completed within a reasonable time; or

  2. Entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner, to undertake a program of actual construction of the unit, to be completed within a reasonable time.

*"Complete application"* means that the application contains all the information necessary for processing the application and that the provisions of § 10.1-1321.1 of the Virginia Air Pollution Control Law have been met. Designating an application complete for purposes of permit processing does not preclude the board from requesting or accepting additional information.

*"Construction"* means fabrication, erection, installation, demolition, relocation, addition, replacement, or modification of an emissions unit that would result in a change in the uncontrolled emission rate.

*"Construction waste"* means solid waste that is produced or generated during construction, remodeling, or repair of pavements, houses, commercial buildings, and other structures. Construction wastes include, but are not limited to, lumber, wire, sheetrock, broken brick, shingles, glass, pipe, concrete, paving materials, and metal and plastics if the metal or plastics are a part of the materials of construction or empty containers for such materials. Paints, coatings, solvents, asbestos, any liquid, compressed gases or semi-liquids, and garbage are not construction wastes.

*"Debris waste"* means wastes resulting from land clearing operations. Debris wastes include, but are not limited to, stumps, wood, brush, leaves, soil, and road spoils.

*"Demolition waste"* means that solid waste that is produced by the destruction of structures or their foundations, or both, and includes the same materials as construction wastes.

*"Diesel engine"* means, for the purposes of 9 VAC 5-80-1105 A 1 b, any internal combustion engine that burns diesel or #2 fuel oil to provide power to processing equipment for a vegetative waste recycling/mulching operation.

*"Emergency"* means a condition that arises from sudden and reasonably unforeseeable events where the primary energy or power source is disrupted or disconnected due to conditions beyond the control of an owner or operator of a facility including:

  1. A failure of the electrical grid;

2. On-site disaster or equipment failure;

3. Public service emergencies such as flood, fire, natural disaster, or severe weather conditions; or

4. An ISO-declared emergency, where an ISO emergency is:

a. An abnormal system condition requiring manual or automatic action to maintain system frequency, to prevent loss of firm load, equipment damage, or tripping of system elements that could adversely affect the reliability of an electric system or the safety of persons or property;

b. Capacity deficiency or capacity excess conditions;

c. A fuel shortage requiring departure from normal operating procedures in order to minimize the use of such scarce fuel;

d. Abnormal natural events or man-made threats that would require conservative operations to posture the system in a more reliable state; or

e. An abnormal event external to the ISO service territory that may require ISO action.

*"Emissions cap"* means any limitation on the rate of emissions of any air pollutant from one or more emissions units established and identified as an emissions cap in any permit issued pursuant to the new source review program or operating permit program.

*"Emissions limitation"* means a requirement established by the board that limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emissions reduction, and any design standard, equipment standard, work practice, operational standard, or pollution prevention technique.

*"Emissions unit"* means any part of a stationary source which emits or would have the potential to emit any regulated air pollutant.

*"Enforceable as a practical matter"* means that the permit contains emissions limitations that are enforceable by the board or the department and meet the following criteria:

1. Are permanent;

2. Contain a legal obligation for the owner to adhere to the terms and conditions;

3. Do not allow a relaxation of a requirement of the implementation plan;

4. Are technically accurate and quantifiable;

ADD 30

5. Include averaging times or other provisions that allow at least monthly (or a shorter period if necessary to be consistent with the implementation plan) checks on compliance. This may include, but not be limited to, the following: compliance with annual limits in a rolling basis, monthly or shorter limits, and other provisions consistent with this article and other regulations of the board; and

6. Require a level of recordkeeping, reporting and monitoring sufficient to demonstrate compliance.

*"Existing stationary source"* means any stationary source other than a new stationary source.

*"Federal hazardous air pollutant new source review program"* means a program for the preconstruction review and approval of the construction, reconstruction, or modification of any stationary source in accordance with regulations specified below and promulgated to implement the requirements of § 112 (relating to hazardous air pollutants) of the federal Clean Air Act.

1. The provisions of 40 CFR 61.05, 40 CFR 61.06, 40 CFR 61.07, 40 CFR 61.08 and 40 CFR 61.15 for issuing approvals of the construction of any new source or modification of any existing source subject to the provisions of 40 CFR Part 61.

2. The provisions of 40 CFR 63.5 for issuing approvals to construct a new source or reconstruct a source subject to the provisions of 40 CFR Part 63, except for Subparts B, D and E.

3. The provisions of 40 CFR 63.50 through 40 CFR 63.56 for issuing Notices of MACT Approval prior to the construction of a new emissions unit.

*"Federally enforceable"* means all limitations and conditions that are enforceable by the administrator and citizens under the federal Clean Air Act or that are enforceable under other statutes administered by the administrator. Federally enforceable limitations and conditions include, but are not limited to, the following:

1. Emission standards, alternative emission standards, alternative emissions limitations, and equivalent emissions limitations established pursuant to § 112 of the federal Clean Air Act, as amended in 1990.

2. New source performance standards established pursuant to § 111 of the federal Clean Air Act, and emission standards established pursuant to § 112 of the federal Clean Air Act before it was amended in 1990.

3. All terms and conditions (unless expressly designated as state-only enforceable) in a federal operating permit, including any provisions that limit a source's potential to emit.

4. Limitations and conditions that are part of an implementation plan established pursuant to § 110, § 111(d) or § 129 of the federal Clean Air Act.

5. Limitations and conditions (unless expressly designated as state-only enforceable) that are part of a federal construction permit issued under 40 CFR 52.21 or any construction permit issued under regulations approved by EPA into the implementation plan.

ADD-31

6. Limitations and conditions (unless expressly designated as state-only enforceable) that are part of a state operating permit where the permit and the permit program pursuant to which it was issued meet all of the following criteria:

a. The operating permit program has been approved by the EPA into the implementation plan under § 110 of the federal Clean Air Act.

b. The operating permit program imposes a legal obligation that operating permit holders adhere to the terms and limitations of such permits and provides that permits that do not conform to the operating permit program requirements and the requirements of EPA's underlying regulations may be deemed not federally enforceable by EPA.

c. The operating permit program requires that all emissions limitations, controls, and other requirements imposed by such permits will be at least as stringent as any other applicable limitations and requirements contained in the implementation plan or enforceable under the implementation plan, and that the program may not issue permits that waive, or make less stringent, any limitations or requirements contained in or issued pursuant to the implementation plan, or that are otherwise federally enforceable.

d. The limitations, controls, and requirements in the permit in question are permanent, quantifiable, and otherwise enforceable as a practical matter.

e. The permit in question was issued only after adequate and timely notice and opportunity for comment by the EPA and the public.

7. Limitations and conditions in a regulation of the board or program that has been approved by EPA under Subpart E of 40 CFR Part 63 for the purposes of implementing and enforcing § 112 of the federal Clean Air Act.

8. Individual consent agreements that EPA has legal authority to create.

*"Federal operating permit"* means a permit issued under the federal operating permit program.

*"Federal operating permit program"* means an operating permit system (i) for issuing terms and conditions for major stationary sources, (ii) established to implement the requirements of Title V of the federal Clean Air Act and associated regulations, and (iii) codified in Article 1 (9 VAC 5-80-50 et seq.), Article 2 (9 VAC 5-80-310 et seq.), Article 3 (9 VAC 5-80-360 et seq.), and Article 4 (9 VAC 5-80-710 et seq.) of this part.

*"Fixed capital cost"* means the capital needed to provide all the depreciable components.

*"Fugitive emissions"* means those emissions that could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

*"General permit"* means a permit issued under this article that meets the requirements of 9 VAC 5-80-1250.

*"Hazardous air pollutant"* means (i) any air pollutant listed in § 112(b) of the federal Clean Air Act, as amended by Subpart C of 40 CFR Part 63, and (ii) incorporated by reference into the regulations of the board in subdivision 1 of 9 VAC 5-60-92.

*"Independent system operator"* or *"ISO"* means a person that may receive or has received by transfer pursuant to § 56-576 of the Code of Virginia any ownership or control of, or any responsibility to operate, all or part of the transmission systems in the Commonwealth.

*"Major modification"* means any project at a major stationary source that would result in a significant emissions increase in any regulated air pollutant. For projects, the emissions increase may take into consideration any state and federally enforceable permit conditions that will be placed in a permit resulting from a permit application deemed complete under the provisions of 9 VAC 5-80-1160 B.

*"Major new source review (NSR) permit"* means a permit issued under the major new source review program.

*"Major new source review (major NSR) program"* means a preconstruction review and permit program (i) for new major stationary sources or major modifications (physical changes or changes in the method of operation); (ii) established to implement the requirements of §§ 112, 165 and 173 of the federal Clean Air Act and associated regulations; and (iii) codified in Article 7 (9 VAC 5-80-1400 et seq.), Article 8 (9 VAC 5-80-1605 et seq.) and Article 9 (9 VAC 5-80-2000 et seq.) of this part.

*"Major stationary source"* means any stationary source that emits, or has the potential to emit, 100 tons or more per year of any regulated air pollutant. For new stationary sources, the potential to emit may take into consideration any state and federally enforceable permit conditions that will be placed in a permit resulting from a permit application deemed complete under the provisions of 9 VAC 5-80-1160 B.

*"Minor new source review (NSR) permit"* means a permit issued pursuant to this article.

*"Minor new source review (minor NSR) program"* means a preconstruction review and permit program (i) for regulated air pollutants from new stationary sources or projects that are not subject to review under the major new source review program; (ii) established to implement the requirements of §§ 110(a)(2)(C) and 112 of the federal Clean Air Act and associated regulations; and (iii) codified in this article. The minor NSR program may also be used to implement the terms and conditions described in 9 VAC 5-80-1120 F 1; however, those terms and conditions shall be state-only enforceable and shall not be applicable federal requirements.

*"Modification"* means any physical change in, or change in the method of operation of an emissions unit that increases the uncontrolled emission rate of any regulated air pollutant emitted into the atmosphere by the unit or that results in the emission of any regulated air pollutant into the atmosphere not previously emitted. The following shall not be considered physical changes or changes in the method of operation under this definition:

1. Maintenance, repair and replacement of components that the board determines to be routine for a source type and which does not fall within the definition of "replacement";

2. An increase in the throughput or production rate of a unit (unless previously limited by any state enforceable and federally enforceable permit conditions established pursuant to this chapter), if that increase does not exceed the operating design capacity of that unit;

3. An increase in the hours of operation (unless previously limited by any state enforceable and federally enforceable permit conditions established pursuant to this chapter);

4. Use of an alternative fuel or raw material (unless previously limited by any state enforceable and federally enforceable permit conditions established pursuant to this chapter) if, prior to the date any provision of the regulations of the board becomes applicable to the source type, the emissions unit was designed to accommodate that alternative use. A unit shall be considered to be designed to accommodate an alternative fuel or raw material if provisions for that use were included in the final construction specifications;

5. Use of an alternative fuel or raw material that the emissions unit is approved to use under any new source review permit;

6. The addition, replacement or use of any system or device whose primary function is the reduction of air pollutants, except when a system or device that is necessary to comply with applicable air pollution control laws, permit conditions or regulations is replaced by a system or device which the board considers to be less efficient in the control of air pollution emissions;

7. The removal of any system or device whose primary function is the reduction of air pollutants if the system or device is not (i) necessary for the source to comply with any applicable air pollution control laws, permit conditions, or regulations or (ii) used to avoid any applicable new source review program requirement; or

8. A change in ownership at a stationary source.

*"Necessary preconstruction approvals or permits"* means those permits or approvals required under the NSR program that is part of the implementation plan.

*"New source review (NSR) permit"* means a permit issued under the new source review program.

*"New source review (NSR) program"* means a preconstruction review and permit program (i) for regulated air pollutants from new stationary sources or projects (physical changes or changes in the method of operation); (ii) established to implement the requirements of §§ 110(a)(2)(C), 112 (relating to permits for hazardous air pollutants), 165 (relating to permits in prevention of significant deterioration areas), and 173 (relating to permits in nonattainment areas) of the federal Clean Air Act and associated regulations; and (iii) codified in this article, Article 7 (9 VAC 5-80-1400 et seq.), Article 8 (9 VAC 5-80-1605 et seq.) and Article 9 (9 VAC 5-80-2000 et seq.) of this part. The NSR program may also be used to implement the terms and conditions described in 9 VAC 5-80-1120 F 1; however, those terms and conditions shall be state-only enforceable and shall not be applicable federal requirements.

*"New stationary source"* means any stationary source to be constructed at or relocated to an undeveloped site.

*"Nonroad engine"* means any internal combustion engine:

1. In or on a piece of equipment that is self-propelled or serves a dual purpose by both propelling itself and performing another function (such as garden tractors, off-highway mobile cranes and bulldozers);

2. In or on a piece of equipment that is intended to be propelled while performing its function (such as lawnmowers and string trimmers); or

ADD-34

3. That, by itself or in or on a piece of equipment, is portable or transportable, meaning designed to be capable of being carried or moved from one location to another. Indications of transportability include, but are not limited to, wheels, skids, carrying handles, dollies, trailers, or platforms.

An internal combustion engine is not a nonroad engine if (i) the engine is used to propel a motor vehicle or a vehicle used solely for competition, or is subject to standards promulgated under § 202 of the federal Clean Air Act; or (ii) the engine otherwise included in subdivision 3 of this definition remains or will remain at a location for more than 12 consecutive months or a shorter period of time for an engine located at a seasonal source.

For purposes of this definition, a location is any single site at a building, structure, facility, or installation. Any engine or engines that replace an engine at a location and that are intended to perform the same or similar function as the engine replaced will be included in calculating the consecutive time period. An engine located at a seasonal source is an engine that remains at a seasonal source during the full annual operating period of the seasonal source. A seasonal source is a stationary source that remains in a single location on a permanent basis (i.e., at least two years) and that operates at the single location approximately three months or more each year. This subdivision does not apply to an engine after the engine is removed from the location.

*"Plantwide applicability limitation (PAL)"* means an emissions limitation expressed in tons per year, for a pollutant at a major stationary source, that is enforceable as a practical matter and established sourcewide in accordance with 9 VAC 5-80-1865 or 9 VAC 5-80-2144.

*"PAL permit"* means the state operating permit issued by the board that establishes a PAL for a major stationary source.

*"Portable,"* in reference to emissions units, means an emissions unit that is designed to have the capability of being moved from one location to another for the purpose of operating at multiple locations and storage when idle. Indications of portability include, but are not limited to, wheels, skids, carrying handles, dolly, trailer, or platform.

*"Potential to emit"* means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment, and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design only if the limitation or its effect on emissions is state and federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

*"Precursor pollutant"* means the following:

1. Volatile organic compounds and nitrogen oxides are precursors to ozone.

2. Sulfur dioxide is a precursor to $PM_{2.5}$.

3. Nitrogen oxides are presumed to be precursors to $PM_{2.5}$ in all $PM_{2.5}$, unless the board determines that emissions of nitrogen oxides from sources in a specific area are not a significant contributor to that area's ambient $PM_{2.5}$ concentrations.

4. Volatile organic compounds and ammonia are presumed not to be precursors to $PM_{2.5}$, unless the board determines that emissions of volatile organic compounds or ammonia from sources in a specific area are a significant contributor to that area's ambient $PM_{2.5}$ concentrations.

ADD-35

*"Process operation"* means any method, form, action, operation, or treatment of manufacturing or processing, including any storage or handling of materials or products before, during, or after manufacturing or processing.

*"Project"* means any change at an existing stationary source consisting of the addition, replacement, or modification of one or more emissions units.

*"Public comment period"* means a time during which the public shall have the opportunity to comment on the permit application information (exclusive of confidential information) for a new stationary source or project, the preliminary review and analysis of the effect of the source upon the ambient air quality, and the preliminary decision of the board regarding the permit application.

*"Reactivation"* means beginning operation of an emissions unit that has been shut down.

*"Reconstruction"* means, for the sole purposes of 9 VAC 5-80-1210 A, B, and C, the replacement of an emissions unit or its components to such an extent that:

1. The fixed capital cost of the new components exceeds 50% of the fixed capital cost that would be required to construct a comparable entirely new unit;

2. The replacement significantly extends the life of the emissions unit; and

3. It is technologically and economically feasible to meet the applicable emission standards prescribed under regulations of the board.

Any determination by the board as to whether a proposed replacement constitutes reconstruction shall be based on:

1. The fixed capital cost of the replacements in comparison to the fixed capital cost of the construction of a comparable entirely new unit;

2. The estimated life of the unit after the replacements compared to the life of a comparable entirely new unit;

3. The extent to which the components being replaced cause or contribute to the emissions from the unit; and

4. Any economic or technical limitations on compliance with applicable standards of performance that are inherent in the proposed replacements.

*"Regulated air pollutant"* means any of the following:

1. Nitrogen oxides or any volatile organic compound.

2. Any pollutant (including any associated precursor pollutant) for which an ambient air quality standard has been promulgated.

3. Any pollutant subject to any standard promulgated under 40 CFR Part 60.

---

ADD-36

4. Any pollutant subject to a standard promulgated under or other requirements established under 40 CFR Part 61 and any pollutant regulated under 40 CFR Part 63.

5. Any pollutant subject to a regulation adopted by the board.

*"Relocation"* means a change in physical location of a stationary source or an emissions unit from one stationary source to another stationary source.

*"Replacement"* means the substitution of an emissions unit for an emissions unit located at a stationary source, which will thereafter perform the same function as the replaced emissions unit.

*"Secondary emissions"* means emissions which occur or would occur as a result of the construction or operation of a new stationary source or an emissions unit, but do not come from the stationary source itself. For the purpose of this article, secondary emissions must be specific, well-defined, and quantifiable; and must affect the same general areas as the stationary source that causes the secondary emissions. Secondary emissions include emissions from any off site support facility that would not be constructed or increase its emissions except as a result of the construction or operation of the stationary source or emissions unit. Secondary emissions do not include any emissions that come directly from a mobile source, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

*"Significant"* means:

1. In reference to an emissions increase, an increase in potential to emit that would equal or exceed any of the following rates:

a. In ozone nonattainment areas classified as serious or severe in 9 VAC 5-20-204:

| Pollutant | Emissions Rate |
| --- | --- |
| Carbon Monoxide | 100 tons per year (tpy) |
| Nitrogen Oxides | 25 tpy |
| Sulfur Dioxide | 40 tpy |
| Particulate Matter (PM) | 25 tpy |
| Particulate Matter (PM$_{10}$) | 15 tpy |
| Particulate Matter (PM$_{2.5}$) | 10 tpy |
| Volatile organic compounds | 25 tpy |
| Lead | 0.6 tpy |

b. In all other areas:

| Pollutant | Emissions Rate |
|---|---|
| Carbon Monoxide | 100 tons per year (tpy) |
| Nitrogen Oxides | 40 tpy |
| Sulfur Dioxide | 40 tpy |
| Particulate Matter (PM) | 25 tpy |
| Particulate Matter ($PM_{10}$) | 15 tpy |
| Particulate Matter ($PM_{2.5}$) | 10 tpy |
| Volatile organic compounds | 40 tpy |
| Lead | 0.6 tpy |

2. In reference to an emissions increase for a regulated air pollutant not listed in subdivision 1 of this definition, there is no emissions rate that shall be considered significant.

3. If the particulate matter ($PM_{10}$ or $PM_{2.5}$) emissions for a stationary source or emissions unit can be determined in a manner acceptable to the board and the emissions increase is determined to be significant using the emission rate for particulate matter ($PM_{10}$ or $PM_{2.5}$), the stationary source or emissions unit shall be considered to be significant for particulate matter (PM). If the emissions of particulate matter ($PM_{10}$ or $PM_{2.5}$) cannot be determined in a manner acceptable to the board, the emission rate for particulate matter (PM) shall be used to determine whether the emissions increase is significant.

*"Significant emissions increase"* means, for a regulated air pollutant, an increase in emissions that is significant for that pollutant.

*"Site"* means one or more contiguous or adjacent properties under the control of the same person (or persons under common control).

*"Source category schedule for standards"* means the schedule (i) issued pursuant to § 112(e) of the federal Clean Air Act for promulgating MACT standards issued pursuant to § 112(d) of the federal Clean Air Act and (ii) incorporated by reference into the regulations of the board in subdivision 2 of 9 VAC 5-60-92.

*"Space heater"* means any fixed or portable, liquid or gaseous fuel-fired, combustion unit used to heat air in a space, or used to heat air entering a space, for the purpose of maintaining an air temperature suitable for comfort, storage, or equipment operation. Space heaters do not include combustion units used primarily for the purpose of conditioning or processing raw materials or product, such as driers, kilns, or ovens.

*"State enforceable"* means all limitations and conditions that are enforceable as a practical matter, including any regulation of the board, those requirements developed pursuant to 9 VAC 5-170-160, requirements within any applicable order or variance, and any permit requirements established pursuant to this chapter.

*"State operating permit"* means a permit issued under the state operating permit program.

ADD-38

*"State operating permit program"* means an operating permit program (i) for issuing limitations and conditions for stationary sources; (ii) promulgated to meet the EPA's minimum criteria for federal enforceability, including adequate notice and opportunity for the EPA and public comment prior to issuance of the final permit, and practicable enforceability; and (iii) codified in Article 5 (9 VAC 5-80-800 et seq.) of this part.

*"Stationary source"* means any building, structure, facility or installation that emits or may emit any regulated air pollutant. A stationary source shall include all of the pollutant-emitting activities that belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any watercraft or any nonroad engine. Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same "major group" (i.e., that have the same two-digit code) as described in the "Standard Industrial Classification Manual" (see 9 VAC 5-20-21).

*"Synthetic minor source"* means a stationary source that otherwise has the potential to emit regulated air pollutants in amounts that are at or above those for major stationary sources, as applicable, but is subject to restrictions such that its potential to emit is less than such amounts for major stationary sources. Such restrictions must be enforceable as a practical matter. The term "synthetic minor source" applies independently for each regulated air pollutant that the source has the potential to emit.

*"Temporary facility"* means a facility that (i) is operated to achieve a specific objective (such as serving as a pilot test facility, a process feasibility project, or a remediation project) and (ii) does not contribute toward the commercial production of any product or service (including byproduct and intermediate product) during the operational period. Portable emissions units covered by the exemption under 9 VAC 5-80-1105 A 1 c and facilities used to augment or enable routine production are not considered temporary facilities for the purposes of this definition.

*"Toxic pollutant"* means any air pollutant (i) listed in § 112(b) of the federal Clean Air Act, as amended by Subpart C of 40 CFR Part 63 and (ii) incorporated by reference into the regulations of the board at subdivision 1 of 9 VAC 5-60-92, or any other air pollutant that the board determines, through adoption of regulation, to present a significant risk to public health. This term excludes asbestos, fine mineral fibers, radionuclides, and any glycol ether that does not have a TLV®.

*"Uncontrolled emission rate"* means the emission rate from an emissions unit when operating at maximum capacity without air pollution control equipment. Air pollution control equipment includes control equipment that is not vital to its operation, except that its use enables the owner to conform to applicable air pollution control laws and regulations. Annual uncontrolled emissions shall be based on the maximum annual rated capacity (based on 8,760 hours of operation per year) of the emissions unit, unless the emissions unit or stationary source is subject to state and federally enforceable permit conditions that limit the annual hours of operation. Enforceable permit conditions on the type or amount of material combusted, stored, or processed may be used in determining the uncontrolled emission rate of an emissions unit or stationary source. The uncontrolled emission rate of a stationary source is the sum of the uncontrolled emission rates of the individual emissions units. Secondary emissions do not count in determining the uncontrolled emission rate of a stationary source.

*"Undeveloped site"* means any site or facility at which no emissions units are located at the time the permit application is deemed complete, or at the time the owner begins actual construction, whichever occurs first. An undeveloped site also includes any site or facility at which all of the emissions units have been determined to be shut down pursuant to the provisions of 9 VAC 5-20-220.

*"Vegetative waste"* means decomposable materials generated by land clearing activities and includes shrub, bush and tree prunings, bark, brush, leaves, limbs, roots, and stumps. Vegetative waste does not include construction or demolition waste or any combination of them.

*"Vegetative waste recycling/mulching operation"* means any activity related to size reduction or separating, or both, of clean wood or vegetative waste, or both, by grinding, shredding, chipping, screening, or any combination of them.

ADD-39

Official Virginia Administrative Code, current through 35:23 VA.R July 8, 2019, and fast-track regulations current through 35:23 VA.R July 8, 2019.

(c) Thomson Reuters 2019 by the Commonwealth of Virginia

9 VAC 5-80-1110, 9 VA ADC 5-80-1110

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.   ADD-40

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,497 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

s/ David L. Neal
David L. Neal
SOUTHERN ENVIRONMENTAL LAW CENTER

Dated:  August 16, 2019

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 16, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will automatically send e-mail notifications of such filing to all counsel of record.

<div align="right">

s/ David L. Neal
David L. Neal
SOUTHERN ENVIRONMENTAL LAW CENTER

</div>

Dated: August 16, 2019